# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TEAMSTERS LOCAL 237 WELFARE FUND and TEAMSTERS LOCAL 237 RETIREES' BENEFIT FUND, on behalf of themselves and all others similarly situated,<br><br><br>Plaintiffs,<br><br>v.<br><br>ABBVIE INC., ALLERGAN, INC., ALLERGAN SALES, LLC, ALLERGAN USA, INC., FOREST LABORATORIES, INC., FOREST LABORATORIES HOLDINGS, LTD., FOREST LABORATORIES IRELAND, LTD., and FOREST LABORATORIES, LLC.<br><br>Defendants. | Case No.: _____<br><br><br><br><br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Teamsters Local 237 Welfare Fund and Teamsters Local 237 Retirees' Benefit Fund (collectively "Plaintiffs" or "Local 237") bring this action on behalf of themselves, and all others similarly situated, against AbbVie Inc. ("AbbVie"), Allergan, Inc., Allergan Sales, LLC, Allergan USA, Inc. ("Allergan"), Forest Laboratories, Inc., Forest Laboratories Holdings, LTD., Forest Laboratories Ireland, LTD., and Forest Laboratories, LLC ("Forest") (collectively, "Defendants"). These allegations are based on investigations of counsel, publicly available materials and knowledge, information, and belief.

## INTRODUCTION

1.    This case arises from Defendants' illegal scheme to delay competition in the United States and its territories for Bystolic®, a prescription medication containing the active

pharmaceutical ingredient nebivolol hydrochloride[1] and approved by the U.S. Food and Drug Administration ("FDA") for the treatment of hypertension. Plaintiffs seek overcharge damages arising from Forest's unlawful agreements with Hetero USA, Inc. and Hetero Labs Ltd. ("Hetero"); Torrent Pharmaceuticals Ltd. and Torrent Pharma, Inc. ("Torrent"); Alkem Laboratories Ltd. ("Alkem"); Indchemie Health Specialties Private Ltd. ("Indchemie"); Glenmark Generics Inc., USA, Glenmark Generics Ltd., and Glenmark Pharmaceuticals S.A. ("Glenmark"); Amerigen Pharmaceuticals, Inc. and Amerigen Pharmaceuticals, Ltd. ("Amerigen"); and Watson Pharma, Inc. and Watson Pharmaceuticals, Inc. ("Watson") (collectively the "Settling Generics") not to compete in the market for Bystolic in the United States and its territories.

2.      Bystolic is a beta blocker. It blocks the effects of the hormone epinephrine, thereby causing the heart to beat more slowly and with less force, which in turn lowers blood pressure. In recent years, annual sales of Bystolic in the United States have been over $600 million.

3.      In December 2011—as soon as it was possible to do so—seven drug companies filed applications for FDA approval of generic versions of Bystolic. In March 2012, Forest sued them for infringement of U.S. Patent No. 6,545,040 (the '040 patent). Each generic company contended that its generic would not infringe the asserted patent claims or the claims were invalid.

4.      The generic companies' position in the patent litigation was very strong. An earlier patent had disclosed a nebivolol compound with a mixture of stereoisomers—different three-dimensional shapes of an organic compound—so the '040 patent could not claim a nebivolol compound with the same mixture, or else it would be invalid for anticipation. But the generic companies' drug products contained the disclosed mixture of stereoisomers. Thus, either their products did not infringe the '040 patent, or the '040 patent was invalid.

---

[1] This Complaint uses "nebivolol" and "nebivolol hydrochloride" interchangeably.

5.      Nonetheless, between October 2012 and November 2013, Forest entered into settlement agreements with each of the Settling Generics, each of which permitted the Settling Generics to launch their generic Bystolic products in September 2021—only three months before the expiration of the '040 patent.

6.      In 2019, the reason that Forest was able to forestall competition for so long was revealed: these settlement agreements included large, unjustified payments to the Settling Generics in exchange for the Settling Generics' agreements not to compete in the market for Bystolic. According to documents that became public in March 2019, Forest's settlement agreements required Forest to pay *at least* $15 million to each generic company after February 2014—to say nothing of what Forest may have already paid the Settling Generics—and included side deals and reimbursement of the Settling Generics' litigation costs.

7.      Four of the Settling Generics obtained approval of their generic Bystolic products in 2015, and two obtained approval thereafter. In June 2015, the last patent protecting Bystolic (other than the '040 patent) expired. The only reason that generic Bystolic did not enter the market in 2015 is Forest's unlawful pay-for-delay settlement with each Settling Generic. Due to these settlements, purchasers must pay higher prices for brand Bystolic until September 17, 2021.

8.      Plaintiffs bring this action as end-payers of Bystolic, on their own behalf and on behalf of classes of all similarly situated end-payers (the "Classes"). End-payers are the final link in the chain of distribution of pharmaceuticals; they include consumers and those who pay for any portion of the price the consumer does not pay for (*e.g.* insurers and health and welfare plans like Plaintiffs). Defendants' unlawful conduct has prevented generic nebivolol hydrochloride manufacturers from entering the market with competing generic products and has cost Plaintiffs and the Classes hundreds of millions of dollars in overcharge damages.

9.     Plaintiffs and the Classes seek to recover damages, including multiple damages, under the state antitrust and consumer protection laws enumerated below. Plaintiffs and the Classes also seek injunctive relief under federal law.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action involving common questions of law or fact in which the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; there are more than one hundred members of each class; and at least one member of each of the putative classes is a citizen of a state different from that of one of the Defendants.

11.     This Court also has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367(a).

12.     Venue is appropriate within this District under 28 U.S.C. § 1391. Defendants transact business within this District and/or have agents in and/or that can be found in this District, and a portion of the affected interstate trade and commerce discussed below was carried out in this District. At the time of the unlawful settlements, Forest was headquartered in this District.

13.     The Court has personal jurisdiction over each of the Defendants. Defendants have transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal scheme throughout the United States, including in this District. The scheme has been directed at and has had the intended effect of causing injury to individuals and companies residing in or doing business throughout the United States, including in this District. Personal jurisdiction lies under Fed. R. Civ. P. 4(k)(2) over the foreign domiciliary defendants.

## THE PARTIES

### A.  Plaintiffs

14.     Plaintiffs are Teamsters Local 237 Welfare Fund and Teamsters Local 237 Retirees' Benefit Fund ( "Local 237"). Local 237 consists of two health and welfare benefit plans and is headquartered and with a principal place of business in New, York, New York. Local 237 administers the assets of defined contribution plans formed to provide certain benefits including prescription drug benefits. Local 237 provides health and welfare benefits to active and retired members and participants who reside in numerous locations in the United States. Local 237 purchased and/or provided reimbursement for some or all of the purchase price for Bystolic other than for re-sale, in New York, Alabama, Florida, North Carolina, Maryland, New Jersey, Pennsylvania, Tennessee, Missouri, Ohio, Georgia, Texas, Connecticut, South Carolina, Virginia, and Puerto Rico at supracompetitive prices during the Class Period and has thereby been injured. In addition, there is a substantial probability that Local 237 will in the future purchase one or more of these products manufactured by the Defendants, and it has purchased and/or intends to purchase generic versions of those drugs, other than for re-sale, once they become available. Local 237 paid and reimbursed more for these products than they would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets for Bystolic.

### B.  Defendants

15.     Defendant Forest Laboratories Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 909 Third Avenue, New York, NY 10022.

16.     Defendant Forest Laboratories Ireland Ltd. is an Irish Corporation with a place of business at Clonshaugh Industrial Estate, Dublin 17, Ireland.

17.     Defendant Forest Laboratories Holdings Ltd. is a Bermudian corporation having a principal place of business at 18 Parliament Street, Hamilton HM 11, Bermuda. In or around February 2006, Defendant Forest Laboratories Ireland Ltd. changed its name to Forest Laboratories Holdings Ltd. and changed its residence from Ireland to Bermuda.

18.     Defendant Forest Laboratories LLC is a company organized and existing under the laws of Delaware, with its principal place of business at Morris Corporate Center III, 400 Interpace Parkway, Parsippany, NJ 07054. On July 1, 2014, in a series of transactions, Forest Laboratories, Inc. became a limited liability company named Forest Laboratories LLC.

19.     Forest Laboratories Inc., Forest Laboratories Ireland Ltd., Forest Laboratories Holdings Ltd., and Forest Laboratories LLC are collectively referred to as "Forest" in this Complaint. As a result of various corporate mergers and acquisitions (discussed below), Forest is the predecessor in interest to Allergan and AbbVie.

20.     Defendant Allergan Sales LLC is a company organized and existing under the laws of Delaware, with its principal place of business at 5 Giralda Farms, Madison, New Jersey 07940.

21.     Defendant Allergan Inc. is a Delaware corporation with its principal place of business located at Morris Corporate Center III, 400 Interpace Parkway, Parsippany, New Jersey 07054.

22.     Defendant Allergan USA Inc. is a Delaware corporation with its principal place of business at 5 Giralda Farms, Madison, New Jersey 07940.

23.     Allergan Sales LLC, Allergan Inc., and Allergan USA Inc. are collectively referred to as "Allergan" in this Complaint.

24.     Defendant AbbVie Inc. ("AbbVie") is a corporation organized and existing under the laws of Delaware with its corporate headquarters at 1 North Waukegan Road, North Chicago,

Illinois 60064. AbbVie is the corporate successor to Allergan and Forest, having completed its purchase of Allergan on May 8, 2020.

25.     Forest, Allergan, and AbbVie are collectively referred to as the "Forest Defendants" in this Complaint.

26.     The Forest Defendants' wrongful actions described in this complaint are part of, and were taken in furtherance of, the illegal monopolization scheme and restraint of trade alleged herein. These actions were authorized, ordered, and/or undertaken by the Forest Defendants' various officers, agents, employees, or other representatives while actively engaged in the management of the Forest Defendants' affairs within the course and scope of their duties and employment and with their actual, apparent, or ostensible authority.

**C.  Relevant nonparties**

27.     Watson Pharma Inc. was a corporation organized and existing under the laws of Delaware, having a place of business at Morris Corporate Center III, 400 Interpace Parkway, Parsippany, NJ 07054.

28.     Watson Pharmaceuticals Inc. was a corporation organized and existing under the laws of the State of Nevada, having places of business at 311 Bonnie Circle, Corona, CA 92880 and 360 Mount Kemble Avenue, Morristown, NJ 07962, and its corporate headquarters at Morris Corporate Center III, 400 Interpace Parkway, Parsippany, NJ 07054.

29.     Watson Pharma Inc. and Watson Pharmaceuticals Inc. are referred to collectively as "Watson" in this Complaint.

30.     Actavis Holdco US, Inc. ("Actavis Holdco"), is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Parsippany, New Jersey. In August 2016, Teva Pharmaceuticals USA, Inc. acquired the Actavis generics business of Allergan plc, including Actavis, Inc. Upon the acquisition, Actavis, Inc. - the acquired

Allergan plc generics operating company (formerly known as Watson Pharmaceuticals) - was renamed Allergan Finance, LLC, which in turn assigned all of the assets and liabilities of the former Allergan plc generic business to the newly formed Actavis Holdco, including subsidiaries Actavis Pharma, Inc. and Actavis Elizabeth LLC (a research and development and manufacturing entity for Actavis generic operations), among others. Actavis Holdco is a wholly-owned subsidiary of Teva Pharmaceuticals USA, Inc., which is a Delaware corporation with its principal place of business in North Wales, Pennsylvania. Teva Pharmaceuticals USA, Inc., is a wholly-owned subsidiary of Teva Pharmaceutical Industries Ltd., an Israeli entity.

31.    Actavis Pharma, Inc., is a Delaware corporation with its principal place of business at 400 Interpace Parkway, Parsippany, New Jersey. It is a wholly-owned subsidiary of Actavis Holdco and is a principal operating company in the U.S. for Teva's generic products acquired from Allergan plc. It manufactures, markets, and/or distributes generic pharmaceuticals.

32.    Actavis Holdco and Actavis Pharma, Inc., are referred to collectively as "Actavis" in this Complaint. Teva Pharmaceuticals USA, Inc., and Teva Pharmaceutical Industries Ltd., are referred to collectively as "Teva" in this Complaint.

33.    Torrent Pharmaceuticals Ltd. is an Indian corporation having a principal place of business at Off. Ashram Road, Ahmedabad - 380 009, Gujarat, India.

34.    Torrent Pharma Inc. is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 5380 Holiday Terrace, Suite 40, Kalamazoo, MI 49009. On information and belief, Torrent Pharma Inc. is a wholly-owned subsidiary of Torrent Pharmaceuticals Ltd. On information and belief, Torrent Pharma Inc. acts as the agent of Torrent Pharmaceuticals Ltd.

35.    Torrent Pharmaceuticals Ltd. and Torrent Pharma Inc. are referred to collectively as "Torrent" in this Complaint.

36.    Amerigen Pharmaceuticals Ltd. is a Chinese company having places of business at 197 State Route 18S, Suite 306N, East Brunswick, NJ 08816 and No. 58, Qunxing Yi Road, Suzhou Industrial Park, PRC. 215006.

37.    Amerigen Pharmaceuticals Inc. is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 197 State Route 18S, Suite 306N, East Brunswick, NJ 08816. On information and belief, Amerigen Pharmaceuticals Inc. is a wholly-owned subsidiary of Amerigen Pharmaceuticals Ltd. On information and belief, Amerigen Pharmaceuticals Inc. acts as the agent of Amerigen Pharmaceuticals Ltd.

38.    Amerigen Pharmaceuticals Ltd. and Amerigen Pharmaceuticals Inc. are referred to collectively as "Amerigen" in this Complaint.

39.    Glenmark Generics Inc. is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 750 Corporate Drive, Mahwah, NJ 07430. Glenmark Generics Inc. is the same entity as Glenmark Generics Inc., USA. To the extent Glenmark Generics Inc. is an entity separate and apart from Glenmark Generics Inc., USA, any allegations in this Complaint relating to Glenmark Generics Inc., USA shall apply equally to Glenmark Generics Inc.

40.    Glenmark Generics Ltd. is an Indian company having a place of business at Glenmark House, HDO-Corporate Building, Wing -A, B D Sawant Marg, Chakala, Off Western Express Highway, Mumbai 400099, Maharashtra, India.

41.    Glenmark Pharmaceuticals Ltd. is an Indian corporation having a principal place of business at Glenmark House, HDO-Corporate Building, Wing -A, B D Sawant Marg, Chakala,

Off Western Express Highway, Mumbai 400099, Maharashtra, India. On information and belief Glenmark Generics Inc., USA and Glenmark Generics Ltd. are wholly-owned subsidiaries of Glenmark Pharmaceuticals Ltd. On information and belief, Glenmark Generics Inc., USA is the North American division of Glenmark Generics Ltd. On information and belief, Glenmark Generics Inc., USA, Glenmark Generics Ltd., and Glenmark Pharmaceuticals Ltd. have officers and directors in common. On information and belief, Glenmark Generics Inc., USA acts as the agent of Glenmark Generics Ltd. and Glenmark Pharmaceuticals Ltd.

42.    Glenmark Generics Inc., Glenmark Generics Ltd., and Glenmark Pharmaceuticals Ltd. are referred to collectively as "Glenmark" in this Complaint.

43.    Hetero Labs Ltd. is an Indian corporation having a principal place of business at 7-2-A2, Hetero Corporate Industrial Estate, Sanathnagar Hyderabad 500018 Andhra Pradesh, India.

44.    Hetero USA Inc. is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 1031 Centennial Avenue, Piscataway, NJ 08854. On information and belief, Hetero USA Inc. is a wholly-owned subsidiary of Hetero Labs Ltd. On information and belief, Hetero USA Inc. acts as the agent of Hetero Labs Ltd.

45.    Hetero Labs Ltd. and Hetero USA Inc. are referred to collectively as "Hetero" in this Complaint.

46.    Indchemie Health Specialties Private Ltd. ("Indchemie") is an Indian company having a place of business at 510, Shah & Nahar Industrila Estate, Dr. E. Moses Road, Worli-Mumbai 400018, India.

47.    Alkem Laboratories Ltd. ("Alkem") is an Indian company having a place of business at Alkem House, Devashish, Senapati Bapat Marg, Lower Parel (West), Mumbai 400013, Maharashtra, India.

48.     Hetero USA, Inc., Hetero Labs Ltd., Torrent Pharmaceuticals Ltd., Torrent Pharma, Inc., Alkem Laboratories Ltd;., Indchemie Health Specialties Private Ltd., Glenmark Generics Inc., USA, Glenmark Generics Ltd., Glenmark Pharmaceuticals S.A., Amerigen Pharmaceuticals, Inc., Amerigen Pharmaceuticals, Ltd., Watson Pharma, Inc., and Watson Pharmaceuticals, Inc. are collectively referred to as the "Settling Generics."

49.     Aurobindo Pharma USA, Inc. is a Delaware corporation having a principal place of business at 279 Princeton-Hightstown Road, East Windsor, New Jersey 08520-1401.

50.     Aurobindo Pharma Ltd. is a corporation organized and existing under the laws of India, having a principal place of business at Plot #2, Maitri Vihar, Ameerpet, Hyderabad – 500 038, Andhra Pradesh, India.

51.     Aurobindo Pharma USA, Inc., and Aurobindo Pharma Ltd. are referred to collectively as "Aurobindo" in this Complaint.

52.     Ajanta Pharma Ltd. is a corporation organized and existing under the laws of India, having its principal place of business at No. 98, Ajanta House, Government Industrial Area, Charkop, Kandivali (West) Mumbai, Maharashtra 400067 India.

53.     Ajanta Pharma USA Inc. is a corporation organized and existing under the laws of New Jersey, having its principal place of business at One Grande Commons, 440 U.S. Highway 22 East, Suite 150, Bridgewater, NJ 08807. On information and belief, Ajanta Pharma USA Inc. is a wholly-owned subsidiary of Ajanta Pharma Ltd. On information and belief, Ajanta Pharma USA Inc. is the U.S. agent for Ajanta Pharma Ltd.

54.     Ajanta Pharma Ltd. and Ajanta Pharma USA Inc. are referred to collectively as "Ajanta" in this Complaint.

### D.  Relevant mergers and acquisitions

55.     Numerous mergers and acquisitions among the companies discussed in this Complaint have taken place in the past decade. This Complaint refers to companies by their then-current names, so the following explanation of mergers and acquisitions is provided for clarity.

56.     Watson acquired Actavis on October 31, 2012.[2] Watson changed its name to Actavis on January 24, 2013.[3]

57.     On February 18, 2014, Actavis announced that it was acquiring Forest.[4] The deal closed on July 1, 2014.[5]

58.     On November 17, 2014, Actavis announced that it was acquiring Allergan.[6] The deal closed on March 17, 2015.[7] On June 18, 2015, Actavis announced that it was changing its name to Allergan.[8]

---

[2] https://www.prnewswire.com/news-releases/watson-completes-actavis-acquisition-176682731.html

[3] https://www.fiercepharma.com/m-a/watson-becomes-actavis-and-already-future-muted

[4] https://www.businesswire.com/news/home/20140218005877/en/Actavis-Acquire-Forest-Laboratories-25-Billion-Equity

[5] https://www.prnewswire.com/news-releases/actavis-completes-forest-laboratories-acquisition-265360391.html

[6] https://www.reuters.com/article/us-allergan-actavis/allergan-agrees-to-66-billion-actavis-offer-valeant-walks-idUSKCN0J00W720141117

[7] https://www.prnewswire.com/news-releases/actavis-completes-allergan-acquisition-300051633.html

[8] https://www.biospace.com/article/actavis-officially-changes-name-to-allergan-/

59.    On July 27, 2015, Teva announced that it was acquiring the generics business of Allergan.[9] On August 2, 2016, the deal closed.[10] On information and belief, Teva acquired Watson's approved ANDA referencing Bystolic in this acquisition.

60.    On June 25, 2019, AbbVie announced that it was acquiring Allergan.[11] The deal closed on May 8, 2020.[12]

61.    The following timelines illustrate the transactions.

---

[9] https://www.nytimes.com/2015/07/28/business/dealbook/teva-pharmaceuticals-to-buy-allergans-generics-business.html

[10] https://www.businesswire.com/news/home/20160802006666/en/Teva-Completes-Acquisition-Actavis-Generics

[11] https://news.abbvie.com/news/press-releases/abbvie-to-acquire-allergan-in-transformative-move-for-both-companies.htm

[12] https://news.abbvie.com/news/press-releases/abbvie-completes-transformative-acquisition-allergan.htm





62.     Actavis, Allergan, and then AbbVie, through these transactions, successively assumed responsibility for Forests's performance of the challenged provisions in these agreements, continued to perform those provisions, and benefited from overcharges on sales of Bystolic to Plaintiffs and members of the Classes at the supracompetitive prices made possible by the delay those challenged provisions produced.

## REGULATORY BACKGROUND

### A.  Approval of a first entrant

63.     Under the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 et seq., manufacturers that create a new drug must obtain approval from the Food and Drug Administration ("FDA") to sell the product by filing a New Drug Application ("NDA").[13] An

---

[13] 21 U.S.C. §§ 301-392.

NDA must include specific data concerning the safety and effectiveness of the drug, as well as any information on applicable patents.[14]

64.     When the FDA approves a brand pharmaceutical manufacturer's NDA, the manufacturer may list in *Approved Drug Products with Therapeutic Equivalence Evaluations* (the "Orange Book") certain patents that the manufacturer asserts could reasonably be enforced against a manufacturer that makes, uses, or sells a generic version of the brand drug before the expiration of the listed patents. After the FDA approves the NDA, the brand manufacturer may list such patents in the Orange Book.[15]

65.     The FDA relies completely on the brand manufacturer's truthfulness about patent validity and applicability because it lacks the resources and authority to verify the validity and applicability of the manufacturer's patents. In listing patents in the Orange Book, the FDA merely performs a ministerial act.

66.     When they do not face generic competition, brand manufacturers can usually sell the branded drug far above the marginal cost of production, generating profit margins well in excess of 70% while making hundreds of millions of dollars in sales. The ability of a seller to charge supracompetitive prices is called "market power."

**B.  Approval of a generic drug**

67.     Once lawful periods of patent exclusivity expire on branded drug products, Settling Generics can seek FDA approval to market and sell generic versions of the branded drug. Under the Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417, 98 Stat. 1585 (1984)—commonly known as "Hatch-Waxman"—competitors wishing to sell a generic

---

[14] 21 U.S.C. §§ 355(a), (b).

[15] 21 U.S.C. §§ 355(b)(1), (c)(2).

equivalent of a branded drug may file an abbreviated new drug application ("ANDA"), which relies in substantial part on the scientific findings of safety and efficacy contained in the branded drug manufacturer's NDA. The brand drug is called the reference listed drug ("RLD").

68.    To gain FDA approval, generic drugs must be bioequivalent to their branded counterparts. Bioequivalence means that the active ingredient of the proposed generic would be present in the blood of a patient to the same extent and for the same amount of time as the active ingredient of the brand.[16] Bioequivalent drug products containing identical amounts of the same active ingredients, having the same route of administration and dosage form, and meeting applicable standards of strength, quality, purity, and identity are therapeutically equivalent and may be substituted for one another. The FDA assigns an "AB" rating to generics that meet the necessary criteria in relation to their branded counterparts.

69.    Because generic drugs are therapeutically equivalent to brand-name drugs, Settling Generics compete by offering their drugs at low prices. Entry of a single generic can result in steep price reductions for purchasers. Entry of several generics tends to result in even steeper price reductions, driving price down close to marginal manufacturing costs.

70.    To benefit from these low prices, every state has adopted substitution laws requiring or permitting pharmacies to substitute AB-rated generic equivalents when filling branded drug prescriptions, unless the prescribing physician specifically directs otherwise. Due in part to these substitution laws, the launch of AB-rated generics causes a rapid price decline and shift from branded to generic drug sales. A generic often captures 80% or more of the market within the first six months of entry, regardless of the number of generic entrants. The effects of generic entry are still more dramatic after a year. The FTC found that on average, within a year of generic entry,

---

[16] 21 U.S.C. § 355(j)(8)(B).

generics had captured 90% of corresponding brand sales and prices had dropped 85% with multiple generics on the market.[17]

71.    Through the Hatch-Waxman amendments, Congress sought to expedite the entry of less expensive generic competitors to brand drugs, thereby reducing healthcare expenses nationwide. Congress also sought to protect pharmaceutical manufacturers' incentives to create new and innovative products.

72.    The Hatch-Waxman amendments achieved both goals, advancing substantially the rate of generic product launches and ushering in an era of historically high profit margins for brand pharmaceutical manufacturers. In 1983, before the Hatch-Waxman amendments, only 35% of the top-selling drugs with expired patents had generic alternatives; by 1998, nearly all did. In 1984, prescription drug revenues for brands and generics totaled $21.6 billion; by 2013, total prescription drug revenues had climbed to more than $329.2 billion, with generics accounting for 86% of prescriptions.[18] Generics are dispensed about 95% of the time when a generic form is available.[19]

### C. Regulatory exclusivities

73.    A "new chemical entity" is a drug that contains no active moiety—the part of the drug responsible for the physiological or pharmacological action of the drug—that the FDA has approved in another NDA.[20] Approval of an NDA with a new chemical entity provides a five-year exclusivity during which the FDA cannot approve an ANDA for a drug containing the same active

---

[17] See Federal Trade Commission, Pay-for-Delay: How Drug Company Pay-Offs Cost Consumers Billions 8 (2010), https://www.ftc.gov/sites/default/files/documents/reports/pay-delay-how-drug- company-payoffs- cost-consumers-billions-federal-trade-commission-staff-study/100112payfordelayrpt.pdf.

[18] See IMS Institute for Healthcare Informatics, *Medicine Use and Shifting Costs of Healthcare: A Review of the Use of Medicines in the United States in 2013* 30, 51 (2014).

[19] *Id.* at 51.

[20] 21 C.F.R. § 314.108(a).

moiety as the new chemical entity.[21] An ANDA "may be submitted after 4 years" if it contains a Paragraph IV certification, described below.[22]

74.    An ANDA must contain a patent certification for each patent which claims the RLD or a use of the RLD for which the applicant is seeking approval. There are four types:

i.    The patent information has not been filed (a "paragraph I certification");

ii.    The patent has expired (a "paragraph II certification");

iii.    The patent will expire on a specific date, and the applicant will not market the drug before then (a "paragraph III certification"); or

iv.    The patent is invalid or will not be infringed by the manufacture, use, or sale of the generic drug (a "paragraph IV certification").[23]

75.    The first generic manufacturer to file an ANDA with a paragraph IV certification qualifies as a "first applicant" under Hatch-Waxman. More than one applicant may qualify as a first applicant if they submit paragraph IV certifications at substantially the same time.

76.    Hatch-Waxman encourages generic companies to challenge patents by affording first applicants a 180-day exclusivity period in which the FDA may not grant final approval to any other generic manufacturer's ANDA for the same drug.[24] During this 180-day period, the first applicant competes only with the brand manufacturer and any other first applicants. To compete more effectively, the brand manufacturer sometimes lowers the price of the brand drug or introduces an "authorized generic" or "AG," which is chemically identical to the brand drug and

---

[21] 21 C.F.R. § 314.108(b)(2).

[22] 21 C.F.R. § 314.108(b)(2).

[23] *See* 21 U.S.C. 355(j)(2)(A)(vii).

[24] 21 U.S.C. § 355(j)(5)(B)(iii).

sold under the brand's NDA, but sold as a generic, typically either through a subsidiary or a third-party distributor.

77.     The Supreme Court has recognized that "this 180-day period of exclusivity can prove valuable, possibly 'worth several hundred million dollars'" to the first filer.[25]

### D.  Hatch-Waxman patent infringement litigation

78.     If a generic manufacturer submits a paragraph IV certification, and the brand manufacturer has an objectively reasonable basis to claim that the generic drug will infringe the brand's valid patent, the brand can sue the generic for infringement. If the brand files such an action within 45 days after receiving notice of the paragraph IV certification, the FDA will not grant final approval until the earlier of (a) 30 months' passage, or (b) entry of a final judgment holding that the patent is invalid or not infringed by the generic formulation.[26]

79.     A generic manufacturer facing a claim of patent infringement may defend by counterclaiming that the patent is invalid or unenforceable, or that the generic does not infringe the patent.

80.     In the pharmaceutical sector, these defenses often succeed. The FTC reports that generics prevailed in 73% of Hatch-Waxman patent litigation cases resolved on the merits between 1992 and 2002.[27] An empirical study of all substantive decisions rendered in every patent case

---

[25] *FTC v. Actavis, Inc.*, 570 U.S. 136, 133 S. Ct. 2223, 2229 (2013) (quoting C. Scott Hemphill, *Paying for Delay: Pharmaceutical Patent Settlement as a Regulatory Design Problem*, 81 N.Y.U. L. Rev. 1553, 1579 (2006)).

[26] 21 U.S.C. §§ 355(c)(3)(C), (j)(5)(B)(iii).

[27] FTC, *Generic Drug Entry Prior to Patent Expiration: AN FTC Study* vi-vii (2002), https://www.ftc.gov/sites/default/files/documents/reports/generic-drug-entry-prior-patent-expiration-ftc-study/genericdrugstudy_0.pdf.

filed in 2008 and 2009 similarly reports that when a generic challenger stays the course until a decision on the merits, the generic wins 74% of the time.[28]

### E.  Pay-for-delay or reverse payment settlements

81.    A brand manufacturer may attempt to settle its patent infringement claim against a generic manufacturer that has submitted a paragraph IV certification. In a "pay-for-delay" or "reverse payment" settlement, the brand pays the generic in exchange for the generic's agreement not to enter the market for a specified amount of time. This structure is the opposite of a typical settlement structure because the plaintiff alleging infringement pays the defendant, rather than vice versa.

82.    Reverse payments can be anticompetitive.[29] The brand may offer to divide its monopoly profits with the generic so that each makes greater profits under the brand's monopoly than either would make under competitive conditions.[30] In this way, even a brand manufacturer with a facially invalid patent can convince a generic manufacturer to settle because the value of the settlement to the generic exceeds the value of its winning the patent suit.

83.    The payment may be divided into an up-front payment and subsequent payment, which are often ongoing for as long as the generic stays out of the market. Reverse payments also can take the form of the brand manufacturer offering the generic manufacturer non-monetary consideration. The brand and the generic may strike a "side deal" in which the generic provides some services to the brand, and the brand pays far above market value for the services.

---

[28] John R. Allison, Mark A. Lemley & David L. Schwartz, *Understanding the Realities of Modern Patent Litigation*, 92 Tex. L. Rev. 1769, 1787 (2014) ("[P]atentees won only 164 of the 636 definitive merits rulings, or 26%," and "that number is essentially unchanged" from a decade ago.).

[29] *See FTC v. Actavis, Inc.*, 570 U.S. 136 (2013).

[30] *Id.* at 154.

84.     Even if the brand manufacturer's patent is invalid or unenforceable, a pay-for-delay agreement diminishes other Settling Generics' incentives to challenge the patent. The private agreement enables the first applicant to retain the statutory 180-day period of exclusivity—the reward for proving patent invalidity. Even if a later-filing generic manufacturer could successfully defend a claim of patent infringement, it would thereby acquire only the right to enter the market at the same time as every other generic manufacturer. And in such a competitive market, profits are relatively low.

85.     In short, a pay-for-delay agreement allows a brand manufacturer whose patent is invalid or unenforceable to share some of its unjustified monopoly profits with a first-filer generic manufacturer. That sort of agreement violates antitrust law.

## FACTS

### A. Janssen patents Bystolic.

86.     Janssen Pharmaceutica ("Janssen"), a subsidiary of Johnson & Johnson, researched the use of nebivolol to treat high blood pressure and heart failure in the 1980s and 1990s. It obtained a series of patents related to this invention.

| The Bystolic Patents | | | | |
|---|---|---|---|---|
| Patent No. | Application No. | First Named Inventor | Issue Date | Expiration Date |
| 4,654,362 | 06/660,355 | Van Lommen | March 31, 1987 | March 31, 2004 |
| 5,759,580 | 08/669,415 | Jans | June 2, 1998 | June 2, 2015 |
| 6,545,040 | 07/825,488 | Xhonneux | April 8, 2003 | December 17, 2021 |

87.     On March 31, 1987, the United States Patent and Trademark Office ("PTO") issued United States Patent No 4,654,362 (the "'362 Patent"). Among other things, the '362 Patent discloses the following chemical compound, which is referred to in the '362 Patent as Compound 84 but is now known as nebivolol hydrochloride: $C_{22}H_{25}F_2NO_4$.

88.    Soon after, Janssen filed an application for another patent. The patent application resulting in the '040 patent—the '488 application—was a continuation of Application No. 07/325,181, filed on March 16, 1989, and later abandoned, which was a continuation-in-part of Application No. 07/172,747, filed on March 23, 1988, and later abandoned.

89.    The '488 application thus had a priority date of March 23, 1988, meaning that it had to claim an invention that was patentable as of that date.

90.    U.S. Patent No. 4,654,362 ("Van Lommen") was prior art to the '488 application because it issued a year before the '488 application's priority date.

91.    Van Lommen disclosed a chemical compound $C_{22}H_{25}F_2NO_4$. This molecule, like many organic molecules, has several stereoisomers. In chemistry, the term "stereoisomer" refers to the spatial arrangement of atoms within a molecule, such that stereoisomers are the same molecular compound (that is, they contain the same types of atoms and the same number of each type), but the physical arrangement of their atoms in space is different. This physical arrangement is often important in pharmaceutical development because it is common that one stereoisomer of a compound will treat a particular ailment while another will not.

92.    For nebivolol hydrochloride, the stereoisomers may be identified by various permutations of a four-letter sequence including the letters S and R. The same letters in reverse identify the same stereoisomer, such that, for example, SRRR is the same as RRRS. There are thus ten distinct stereoisomers.

    1.  SRRR (same as RRRS)

    2.  RSSS (same as SSSR)

    3.  SRRS

    4.  RSSR

5.  SRSR (same as RSRS)

6.  SRSS (same as SSRS)

7.  RSRR (same as RRSR)

8.  RRSS (same as SSRR)

9.  SSSS

10. RRRR

93.    On January 24, 1992, Charles J. Metz, a patent prosecutor acting on behalf of named inventors Raymond Mathieu Xhonneux *et al.*, filed the continuation '488 application, accompanied by two declarations, one of which was signed by Dr. Xhonneaux (the "Xhonneaux Declaration").

94.    The Xhonneaux Declaration provided evidence purporting to show that the SRRR stereoisomer reduces blood pressure and heart rate by itself, and that the SRRR and RSSS stereoisomers reduce blood pressure more together than the SRRR stereoisomer does by itself.

95.    The '488 application thus sought to claim the combination of the SRRR and RSSS stereoisomers.

96.    Over the next several years, the patent examiner repeatedly rejected the application on the ground that, among other things, the claims were anticipated by and obvious in light of Van Lommen.

97.    Part of the basis for the anticipation rejection was the transition of the patent claims. Every patent claim has three parts: a preamble, a transition, and a body.[31] A very simple example of a patent claim is:

1. A widget comprising:

---

[31] Janice M. Mueller, *Patent Law*, 4th Edition, at 90 (2013).

Part A;
Part B; and
Part C, attaching said Part A to said Part B;

Wherein said Part A is made of copper and said Part B is made of lead and said Part C is made of gold.[32]

In the above example, the preamble is "A widget," the transition is "comprising," and the remainder is the body.[33] The transition is a term of art that affects the scope of the claim.[34] The three primary transitions used in practice are "comprising," "consisting of," and "consisting essentially of."[35]

98.     "Comprising" is the broadest of the three transitions, and indicates that the claim is "open" in the sense that it will be literally infringed by another's product that includes each of the explicitly recited elements of the claim, whether or not the potentially infringing product includes other elements.[36] Using the example above, the addition of Parts D, E, F, and G to the claimed invention would not avoid infringement.[37]

99.     "Consisting of" is the narrowest of the three transitions, and indicates that the claim is "closed" in the sense that it is only infringed by another's product that includes each element of the claimed invention, *but nothing else*. Using the example above, if the transition were "consisting of" rather than "comprising," then the addition of Part D to another's product would avoid infringement.

---

[32] *Id*.

[33] *Id*. at 90-91.

[34] *Id*. at 92.

[35] *Id*.

[36] *Id*. at 95.

[37] *Id*.

100.    "Consisting essentially of" is generally used when claiming chemical compositions, and means that the claim is closed, except that the addition of elements that do not change the essential function or properties of the composition does not avoid infringement.[38] If the example above were a chemical compound containing Parts A, B, and C, then the addition of Part D may avoid infringement, but only if the addition of Part D changes the essential function or properties of the compound.[39]

101.    Initially, the '488 application used the broadest "comprising" transition, indicating that the patent would be infringed by any chemical composition that included the SRRR and RSSS stereoisomers, even if the chemical composition contained other elements. The claim was rejected based on the prior art disclosed in Van Lommen.

102.    The application was re-filed with the "consisting essentially of" transition, indicating that the patent would be infringed by a chemical composition that included the SRRR and RSSS stereoisomers, unless some other element was added that changed the essential function or properties of the composition.

103.    On February 15, 1994, the examiner issued a final rejection based on, among other things, anticipation by Van Lommen, which the applicants appealed.

104.    After full briefing, the Board of Patent Appeals and Interferences (the "BPAI"; since replaced by the Patent Trial and Appeal Board) reversed the final rejection.

---

[38] *Id.*

[39] *Id.* The example that Professor Mueller provides is that of an adhesive: if the addition of Part D to the adhesive compound does not alter its stickiness, the product would infringe; if the addition of Part D changed the basic nature of the adhesive from a permanent bond like SuperGlue® to a removable adhesive like that found on Post-It® notes, the product would not infringe. *Id.*

105.    Based on the Xhonneux Declaration, the BPAI reversed the obviousness rejection "on the strength of appellants' rebuttal evidence establishing that the claimed subject matter possesses unexpectedly superior results." The BPAI did so because the patent examiner had failed to meaningfully address the Xhonneux Declaration.

106.    In the course of briefing, the patent examiner withdrew the anticipation rejection. The BPAI nonetheless directed the examiner to reevaluate claims for anticipation.

107.    In particular, one of the claims at the time—Claim 26—was directed to a pharmaceutical composition "consisting essentially of" a pharmaceutically acceptable carrier and, as active ingredients, the SRRR stereoisomer and the RSSS stereoisomer, with "the RSSS stereoisomer present in an amount capable of potentiating the blood pressure lower effect of the SRRR stereoisomer."

108.    The BPAI, quoting Application of Herz, 537 F.2d 549, 551-52 (C.C.P.A. 1976), noted that "the phrase 'consisting essentially of' limits the scope of a claim to the specified ingredients and those that do not materially affect the basic and novel characteristic(s) of a composition." The BPAI continued that "[h]ere, a basic and novel characteristic of the pharmaceutical composition of Claim 26 is its blood pressure reducing or antihypertensive effect. Thus, Claim 26 is open to ingredients that do not materially affect its antihypertensive activity."

109.    The BPAI then observed that "Van Lommen's antihypertensive compound 84 is a mixture of four stereoisomers: RSSS, SRRR, RSRR and SRSS. Because the RSRR and SRSS stereoisomers do not materially affect blood pressure reducing or antihypertensive activity, it appears that they are not excluded from the composition of claim 26." The BPAI then stated that "[o]n return of the application, we recommend that the examiner reevaluate the patentability of

Claim 26, and any claims depending therefrom, under 35 U.S.C. § 102 [anticipation] in light of Van Lommen."

110.    The BPAI concluded: "It is axiomatic that one cannot patent what is old. . . . [I]f the examiner determines that the claimed subject matter is described by Van Lommen under 35 U.S.C. § 102, declaration evidence establishing unexpectedly superior results would be unavailing to the applicants."

111.    The examiner never made this determination. After the appeal, on July 23, 2001, the applicants canceled Claim 26 (among other claims) and submitted added and amended claims for continued prosecution.

112.    Among other things, the applicants amended the transition from "consisting essentially of" to "consisting of."

113.    By changing from "consisting essentially of" to "consisting of," the applicants reduced the scope of the claims. The claims no longer covered a pharmaceutical composition with the specified compounds and those that do not materially affect the basic and novel characteristics of the composition. They now generally covered only a pharmaceutical composition with the specified compounds: the RSSS and SRRR stereoisomers and certain inactive ingredients.

114.    With this change, the applicants submitted "that neither a composition consisting of the RSSS enantiomer, nor a composition consisting of the RSSS enantiomer and its enantiomer the SRRR enantiomer, are disclosed in Van Lommen et al." The applicants continued that "Van Lommen discloses the base compound, as an undefined mixture of stereoisomers . . . ." They further reasoned that "Van Lommen's Compound 84 . . . is an undefined mixture of the RSRR, RSSS, SRSS, and SRRR isomers, and Compound 87 . . . is an undefined mixture of the RSRS, RSSR, and SRRS isomers."

115.    They concluded that "it is clear that the cited Van Lommen et al. patent discloses neither a composition consisting of the RSSS enantiomer of the base compound, nor a composition consisting of the RSSS and SRRR enantiomers."

116.    The examiner then allowed the application. The '040 patent issued on April 8, 2003, and was assigned to Janssen.

**B.  Janssen, Mylan, and Forest research and obtain FDA approval for Bystolic.**

117.    On February 21, 2001, Janssen and Mylan entered into a license agreement under which Janssen would manufacture nebivolol and Mylan had exclusive rights to import, use, and sell nebivolol and to make, use, and sell products containing it within the United States and Canada.[40] Mylan could grant sublicences with prior written approval of Janssen.

118.    Mylan filed NDA 21-742, seeking FDA approval of nebivolol under the brand name Bystolic. In 2005, it received an approvable letter—a letter from the FDA listing certain deficiencies that must be corrected before the drug could be approved—and, on January 6, 2006, Mylan and Forest entered into a development and commercialization agreement. Under the terms of this agreement, Mylan granted Forest a sublicense under the 2001 agreement with Janssen, as well as an exclusive license to some of its own know-how related to nebivolol products. Forest would continue to purchase nebivolol from Janssen until Forest was ready to manufacture nebivolol at its own plant.

119.    On December 17, 2007, the FDA approved Bystolic (nebivolol) tablets for the treatment of hypertension, to lower blood pressure. Forest launched Bystolic in 2.5, 5, 10, and 20 mg tablets soon after. The active ingredients in Bystolic are the SRRR and RSSS stereoisomers of

---

[40] *Mylan Inc. v. Comm'r of Internal Revenue*, 111 T.C.M. (CCH) 1199 (T.C. 2016).

nebivolol in approximately a 1:1 ratio. Bystolic also contains other stereoisomers as inactive ingredients.

120.    The FDA also received a request to list the '040 patent and U.S. Patent No. 5,759,580 (the "'580 patent") in the Orange Book as covering Bystolic. Performing its ministerial duty, the FDA did so.

121.    Under the 2006 agreement, Mylan had certain copromotion rights, the option to launch a first authorized generic, and a variety of other rights related to nebivolol, but on February 27, 2008, Mylan and Forest amended their agreement such that Mylan gave up all these rights in exchange for cash payments. Mylan agreed to facilitate any negotiations between Forest and Janssen, if they should prove necessary, and to continue purchasing nebivolol from Janssen and reselling it to Forest. Forest agreed to pay Mylan 1% of the amounts payable to Janssen for the continued supply of nebivolol.

122.    On March 30, 2012, Forest purchased from Janssen all the patents subject to the 2001 agreement and terminated all the nebivolol agreements among Janssen, Forest, and Mylan.

123.    Bystolic became highly profitable for Forest. In an annual 10-K filing, Forest reported that Bystolic achieved sales of $455.1 million in fiscal 2013, which accounted for 16% of Forest's consolidated net sales.[41] This rose to $529.6 million in fiscal 2014.[42]

**C.  The Settling Generics file ANDAs for generic versions of Bystolic.**

124.    In December 2011, generic companies became able to submit ANDAs referencing Bystolic under 21 C.F.R. § 314.108(b)(2). Four years had passed since Bystolic was approved with a New Chemical Entity exclusivity.

---

[41] https://www.sec.gov/Archives/edgar/data/38074/000003807413000014/forest10k2013.htm. Under Forest's definition of fiscal years, fiscal 2013 was the year ending on March 31, 2013.

[42] https://www.sec.gov/Archives/edgar/data/38074/000003807414000019/forest10k2014.htm

125.    Accordingly, in or around December 2011, Watson, Alkem, Glenmark, Torrent, Amerigen, Indchemie, and Hetero submitted ANDAs referencing Bystolic.[43] On information and belief, all seven submitted paragraph III certifications to the '580 patent, which would not expire until June 2015. All seven submitted paragraph IV certifications to the '040 patent. On information and belief, some, if not all, of the seven qualified as first applicants eligible for 180-day exclusivity during which the FDA would not give final approval to any later-filed ANDA holder.

126.    Alkem, Amerigen, Glenmark, Indchemie, Hetero, Torrent, and Watson each timely served Forest with notice letters containing paragraph IV certifications. The following table shows the dates on which the notice letters were served:

| Company | ANDA | Date |
|---|---|---|
| Torrent[44] | 203966 | February 2, 2012 |
| Alkem[45] | 203741 | February 3, 2012 |
| Indchemie[46] | 203828 | February 3, 2012 |
| Watson[47] | 203663 | February 13, 2012 |
| Amerigen[48] | 203659 | February 16, 2012 |
| Hetero[49] | 203825 | February 17, 2012 |
| Glenmark[50] | 203821 | February 20, 2012 |

[43] *See* https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2015/203683Orig1s000Ltr.pdf (Watson);
https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2015/203741Orig1s000ltr.pdf (Alkem);
https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2017/203821Orig1s000ltr.pdf (Glenmark).

[44] Served on February 2, 2012. *Id*. ¶ 93.

[45] Served on February 3, 2012. *Forest Laboratories, et al. v. Indchemie Health Specialties PTV et al.*, 12-cv-01855 (N.D. Ill. Mar. 14, 2012) (ECF No. 1 ¶ 38).

[46] Served on February 3, 2012. *Forest Laboratories, et al. v. Indchemie Health Specialties PTV et al.*, 12-cv-01855 (N.D. Ill. Mar. 14, 2012) (ECF No. 1 ¶ 22).

[47] Served on February 13, 2012. *Id*. ¶ 108.

[48] Served on February 16, 2012. *Forest Laboratories, et al. v. Torrent Pharmaceuticals Ltd. Et al.*, 12-cv-05030 (D. Del. Mar. 13, 2012) (ECF No. 1 ¶ 123).

[49] Served on February 17, 2012. *Forest Laboratories, et al. v. Torrent Pharmaceuticals Ltd. Et al.*, 12-cv-05030 (D. Del. Mar. 13, 2012) (ECF No. 1 ¶ 153).

[50] Served on February 20, 2012. *Id*. ¶ 138.

127.    The notice letters were required to include a detailed statement of the factual and legal bases as to why the '040 Patent was invalid, unenforceable, and/or not infringed by their ANDA products, as well as an offer of confidential access to each Settling Generic's ANDA. The notice letters operate as technical acts of infringement, giving Forest standing to sue each of the Settling Generics.

**D. Forest sues the Settling Generics for infringement of the '040 patent.**

128.    On March 13, 2012, in response to their notice letters, Forest filed a patent infringement lawsuit in the United States District Court for the District of Delaware against Torrent, Watson, Amerigen, Glenmark, and Hetero.[51]

129.    On March 14, 2012, in response to their notice letters, Forest filed a patent infringement lawsuit in the United States District Court for the Northern District of Illinois against Indchemie and Alkem.[52]

130.    By order of the Judicial Panel for Multidistrict Litigation, these cases were consolidated into *In re Nebivolol Patent ('040) Litigation*, 12-cv-5026 (N.D. Ill. June 12, 2012) (ECF No. 1) (the "Bystolic Patent Litigation").

131.    The Bystolic Patent Litigation was meritless. The only independent claim asserted by Forest was Claim 2, which is limited to a pharmaceutical composition consisting of a pharmaceutically acceptable carrier and, as active ingredients, the SRRR and RSSS stereoisomers of nebivolol. The other claims that Forest asserted were dependent claims— that is, each fully

---

[51] *Forest Laboratories, et al. v. Torrent Pharmaceuticals Ltd. Et al.*, 12-cv-05030 (D. Del.).

[52] *Forest Laboratories, et al. v. Indchemie Health Specialties PTV et al.*, 12-cv-01855 (N.D. Ill. Mar. 14, 2012) (ECF No. 1).

incorporated Claim 2, then added additional limitations that further narrowed the scope of the claim.

132.    On May 29, 2012, less than three months into the litigation and before the JPML centralized the Bystolic Patent Litigation, Indchemie and Alkem filed an early motion for summary judgment on non-infringement.[53] These defendants argued that "Forest must show that the accused ANDA products contain only the ingredients of Claim 2, and no other ingredients, in order to prove infringement[,]" but "Defendants' ANDA products have more . . . ."[54] The court postponed decision on this motion.[55]

133.    On October 24, 2012, before any substantial decisions, Forest and Hetero entered into a settlement agreement. The following day, they filed a stipulation that enjoins Hetero from selling generic nebivolol hydrochloride tablets in the United States during the life the '040 patent absent a license agreement or other authorization by Forest.[56]

134.    Between then and February 2013, Glenmark, Torrent, Indchemie, and Alkem settled, filing similar stipulations.[57]

135.    From February 2013 to June 2013, Amerigen and Actavis briefed claim construction.[58] On July 19, 2013, the court held a tutorial hearing.[59]

---

[53] *Forest Laboratories, Inc. et al. v. Indchemie Health Specialties et al.*, No. 12-cv-1855 (N.D. Ill.), ECF Nos. 55 (sealed), 60 (redacted public version).

[54] *Forest Laboratories, Inc. et al. v. Indchemie Health Specialties et al.*, No. 12-cv-1855 (N.D. Ill.), ECF No. 60 at 8.

[55] *See In re Nebivolol ('040) Patent Litigation*, No.12-cv-05026 (N.D. Ill.), ECF No. 2.

[56] *In re Nebivolol ('040) Patent Litig.*, 12-cv-5026 (N.D. Ill.), ECF No. 73, at 6-7.

[57] *In re Nebivolol ('040) Patent Litig.*, 12-cv-5026 (N.D. Ill.), ECF Nos. 95 (Glenmark), 103 (Torrent), 115 (Indchemie), 116 (Alkem).

[58] *In re Nebivolol ('040) Patent Litig.*, 12-cv-5026 (N.D. Ill.), ECF Nos. 112, 132, 139.

[59] *In re Nebivolol ('040) Patent Litig.*, 12-cv-5026 (N.D. Ill.), ECF No. 146.

136.    Amerigen and Actavis argued in their claim construction briefing that Claim 2 in the '040 patent included only the RSSS and SRRR stereoisomers of nebivolol and not any others.[60] Under this reasoning, Amerigen's and Actavis's generics would not infringe because they included other stereoisomers.

137.    Like Indchemie and Alkem in their summary judgment motion, Amerigen and Actavis based their arguments on the "consisting of" language in Claim 2 and the prosecution history of the '040 patent. The term "consisting of" in Claim 2 of the '040 Patent "excludes any unrecited stereoisomers of nebivolol," and the Settling Generics' products each included at least small amounts of stereoisomers of nebivolol other than SRRR and RSSS.

138.    Moreover, Van Lommen was prior art to the '040 patent and disclosed a variety of mixtures of stereoisomers of nebivolol. Since the BPAI clearly instructed the examiner to consider anticipation in light of Van Lommen, and the applicants amended the claims to close them to the mixture of stereoisomers disclosed in Van Lommen, the applicants could not now argue that the '040 patent included mixtures of stereoisomers, as disclosed in Van Lommen.

139.    This argument put Forest in a bind. If the court agreed with the Settling Generics' construction of the '040 patent, the defendants' generics did not infringe the '040 patent. But if the court ruled that the '040 patent covered mixtures of stereoisomers of nebivolol, the '040 patent was in serious jeopardy of invalidity due to anticipation.

140.    The Settling Generics also had other substantial arguments related to the invalidity of the '040 patent.

---

[60] *In re Nebivolol ('040) Patent Litigation*, No. 12-cv-5026 (N.D. Ill.), ECF Nos. 112 at 16-20, 139 at 2-11.

141. On July 24, 2013, Amerigen's case was stayed, and Amerigen settled shortly thereafter.[61]

142. Finally, Actavis settled. On December 16, 2013, the court entered a stipulation and order dismissing without prejudice all remaining claims, defenses, and counterclaims in the case and terminating the Bystolic Patent Litigation.[62]

143. The following table shows the dates of the joint stipulations of dismissal.

| Company | Stipulation Date |
| --- | --- |
| Hetero | October 25, 2012 |
| Glenmark | December 26, 2012 |
| Torrent | January 14, 2013 |
| Indchemie | February 4, 2013 |
| Alkem | February 4, 2013 |
| Amerigen | September 5, 2013 |
| Actavis | November 7, 2013 |

**E. The Settling Generics obtain approval of their ANDAs, and two more companies file ANDAs and settle.**

144. In 2015 and thereafter, most of the Settling Generics obtained FDA approval of their ANDAs. The following table shows the dates of FDA approval.

| Company | Date of FDA approval of generic Bystolic |
| --- | --- |
| Amerigen | April 16, 2015 |
| Alkem | June 24, 2015 |
| Indchemie | July 29, 2015 |
| Watson[63] | November 27, 2015 |
| Glenmark | May 25, 2017 |
| Torrent | March 2, 2018 |

---

[61] *In re Nebivolol ('040) Patent Litig.*, 12-cv-5026 (N.D. Ill.), ECF Nos. 147, 153.

[62] *In re Nebivolol ('040) Patent Litig.*, 12-cv-5026 (N.D. Ill.), ECF Nos. 164, 165.

[63] At the time, Watson's ANDA was held by Allergan. Teva had agreed to purchase Allergan's generics business.

145.    The '580 patent expired on June 2, 2015. Thus, the only unexpired patent listed in the Orange Book as protecting Bystolic after June 2, 2015, was the '040 patent.

146.    After the Bystolic Patent Litigation, companies have continued to file ANDAs referencing Bystolic. Each has reached a settlement on undisclosed terms before any substantive rulings. The following table illustrates.

| Company | ANDA | PIV notice | Patent case filed | Stipulation of dismissal |
|---------|------|------------|-------------------|--------------------------|
| Aurobindo | 211053 | December 8, 2017 | January 19, 2018 | September 12, 2018 |
| Ajanta | 213349 | May 21, 2019 | July 2, 2019 | December 20, 2019 |

147.    On information and belief, neither Aurobindo nor Ajanta was a first applicant eligible for a 180-day exclusivity. Thus, even if they had successfully defended the patent infringement litigation, neither would have been able to launch until *after* one of the generic companies in the Bystolic Patent Litigation.

**F.  The Bystolic Patent Litigation settlements were unlawful pay-for-delay deals.**

148.    At the times of the settlements in the Bystolic Patent Litigation, the terms were largely confidential, save certain terms that were publicly disclosed.

149.    Forest announced that, under the settlements, it "will provide licenses to each of Actavis, Alkem, Amerigen, Glenmark, Hetero, Indchemie, and Torrent that will permit these companies to launch their generic versions of BYSTOLIC® as of" the later of two events: "(a) three calendar months prior to the expiration of U.S. Patent No. 6,545,040, including any extensions and/or pediatric exclusivities or (b) the date each company receives final FDA approval of its ANDA, or earlier in certain circumstances."[64]

---

[64] https://www.businesswire.com/news/home/20131107005213/en/Forest-Laboratories-Announces-Settlement-BYSTOLIC®-Patent-Litigation

150.    On information and belief, the "or earlier in certain circumstances" language in subsection (b) refers to what is known as a contingent launch provision, which ensures a Settling Generic that if another ANDA filer manages to make it to market prior to the agreed entry date, then the Settling Generic could launch on the same date.

151.    On information and belief, the provision in subsection (b) has not become operative, and Forest and its successors Allergan and AbbVie have taken steps to ensure that it will not become operative, including by settling patent litigation with the later filers Aurobindo and Ajanta.

152.    Under the terms of the settlements, Amerigen, Alkem, Indchemie, Watson, Glenmark, and Torrent—who have obtained FDA approval for their generics—will be permitted to launch on September 17, 2021.

153.    This entry date is peculiar on its face. As the California Supreme Court has explained, "[i]n the absence of payment, one would expect rational parties that settle to select a market entry point roughly corresponding to their joint expectation as to when entry would have occurred, on average, if the patent's validity and infringement had been fully litigated."[65] Rational, profit-maximizing parties would not enter into a lawful settlements in 2012 and 2013 with an entry date three months earlier than the patent's expiration in 2021 unless they believed that it was very likely that the brand company would win the patent litigation.

154.    But Forest's position in the patent litigation was very weak. As discussed above, Forest was relying on a single independent claim in the '040 patent that was either not infringed or was anticipated by Van Lommen (in addition to other risks to Forest posed by the defendants' other arguments).

---

[65] *In re Cipro Cases I & II*, 61 Cal. 4th 116, 151, 348 P.3d 845, 865 (2015).

155.    Given the relative strengths of the parties' positions in the Bystolic Patent Litigation, Forest was not highly likely to prevail. The agreed entry date—three months before the expiration of the '040 patent—thus suggests that the parties were not considering traditional, lawful settlement factors.

156.    Recent public filings in *In re Namenda Direct Purchaser Antitrust Litig.*, 15-cv-07488-CM-RWL (S.D.N.Y.) ("*Namenda*"), confirm that the settlements included another factor: large and unjustified reverse payments.

157.    *Namenda* made public the Agreement and Plan of Merger ("Agreement") related to Actavis's acquisition of Forest in 2014.[66]

158.    Under the Agreement, Forest (the "Company" in the Agreement[67]) was required to disclose all "Company Material Contracts" as defined in Section 3.20.[68]

159.    Section 3.20 defines Company Material Contracts to include, among other things:

(xiv) any Contract involving the settlement of any action or threatened action (or series of related actions) (A) which will (x) involve payments after the date hereof of consideration in excess of $15,000,000 or (y) impose monitoring or reporting obligations to any other Person outside the ordinary course of business or (B) with respect to which material conditions precedent to the settlement have not been satisfied[.][69]

160.    In the corresponding section of its disclosures, Forest disclosed, among other agreements, the following.

a)    SETTLEMENT AGREEMENT between Forest Laboratories, Inc. and Forest Laboratories Holdings, Ltd., and Hetero USA Inc. and Hetero Labs Ltd. dated October 24, 2012, as provided to the FTC on October 26, 2012, together with the FINAL TERM

---

[66] *Namenda*, ECF No. 680-22 at 21 *et seq.*

[67] *Namenda*, ECF No. 680-22 at 25.

[68] *Namenda*, ECF No. 680-22 at 49-50.

[69] *Namenda*, ECF No. 680-22 at 52.

SHEET between Hetero Drugs Ltd. and Forest Laboratories Ireland Ltd. dated October 5, 2012, in connection with the settlement of BYSTOLIC patent dispute;

b) SETTLEMENT AGREEMENT between Forest Laboratories, Inc. and Forest Laboratories Holdings, Ltd., and Torrent Pharmaceuticals Ltd. and Torrent Pharma Inc. dated November 21, 2012, as provided to the FTC on November 28, 2012, together with the PATENT ASSIGNMENT AGREEMENT between Torrent Pharmaceuticals Ltd. and Forest Laboratories Holdings Ltd. dated November 21, 2012, in connection with the settlement of BYSTOLIC patent dispute;

c) SETTLEMENT AGREEMENT between Forest Laboratories, Inc. and Forest Laboratories Holdings, Ltd., and Alkem Laboratories Ltd. dated November 27, 2012, as provided to the FTC on November 30, 2012, together with the TERM SHEET between Alkem Laboratories Ltd., Indchemie Health Specialties Private Ltd., and Forest Laboratories Ireland Ltd. dated November 28, 2012, in connection with the settlement of BYSTOLIC patent dispute. AMENDMENT NO. 1 TO SETTLEMENT AGREEMENT was executed on January 9, 2013 and provided to the FTC on January 10, 2013;

d) SETTLEMENT AGREEMENT between Forest Laboratories, Inc. and Forest Laboratories Holdings, Ltd., and Indchemie Health Specialties Private Ltd. dated November 27, 2012, as provided to the FTC on November 30, 2012, together with the TERM SHEET between Alkem Laboratories Ltd., Indchemie Health Specialties Private Ltd., and Forest Laboratories Ireland Ltd. dated November 28, 2012, in connection with the settlement of BYSTOLIC patent dispute;

e) SETTLEMENT AGREEMENT between Forest Laboratories, Inc. and Forest Laboratories Holdings, Ltd., and Glenmark Generics Inc., USA and Glenmark Generics Ltd. dated December 21, 2012, as provided to the FTC on December 28, 2012, together with the COLLABORATION AND OPTION AGREEMENT between Glenmark Pharmaceuticals S.A. and Forest Laboratories Holdings Ltd. dated December 21, 2012, in connection with the settlement of BYSTOLIC patent dispute;

f) SETTLEMENT AGREEMENT between Forest Laboratories, Inc. and Forest Laboratories Holdings, Ltd., and Amerigen Pharmaceuticals, Inc. and Amerigen Pharmaceuticals, Ltd. dated July 18, 2013, as provided to the FTC on July 23, 2013, together with the BINDING TERM SHEET COLLABORATION AGREEMENT between Forest Laboratories Inc. and Amerigen Pharmaceuticals, Ltd. dated July 18, 2013, in connection with the settlement of BYSTOLIC patent dispute;

g) SETTLEMENT AGREEMENT between Forest Laboratories, Inc. and Forest Laboratories Holdings, Ltd., and Watson Laboratories, Inc. (NV), Watson Laboratories, Inc. (DE), Watson Laboratories, Inc. (NY), Watson Laboratories, Inc. (CT), Watson Pharma, Inc., and Actavis, Inc. dated November 6, 2013, as provided to the FTC on November 18, 2013, together with (a) the LETTER from Forest Laboratories, Inc. to Moksha8, Inc. dated November 1, 2013 and (b) TERMINATION

AND RELEASE AGREEMENT between Actavis, Inc. and Moksha8, Inc. dated November 4, 2012, in connection with the settlement of BYSTOLIC patent dispute.[70]

161.    These agreements are the Bystolic settlements with Hetero, Torrent, Alkem, Indchemie, Glenmark, Amerigen, and Actavis.

162.    That is, all of Forest's settlements with the generic companies in the Bystolic Patent Litigation involved, as of the date of Forest's disclosure letter—February 17, 2014[71]—*future* payments in excess of $15 million. The $15 million payments are in addition to any payments that were made around the times of the settlements in 2012 and 2013.

163.    *Namenda* also made public an email chain among Forest's in-house counsel Eric Agovino and external counsel Ann Malester and Steven Newborn. Ms. Malester sent Mr. Agovino an email, copying Mr. Newborn, that stated:

> Eric,
>
> Before we engage in any discussion with the FTC on the Namenda agreements, we think it would be prudent for us to review all of the Bystolic settlement and licensing agreements as well as the side agreements with those generic companies. Could you put together the same type of information for Bystolic as you sent us for Namenda?
>
> Thanks so much, Ann

164.    Mr. Agovino replied:

> We entered into settlement agreements with the following defendants:
>
> 1) Hetero
>
> 2) Torrent
>
> 3) Alkem
>
> 4) Indchemie

---

[70] *Namenda*, ECF No. 680-22 at 179-80.

[71] *Namenda*, ECF No. 680-22 at 127.

5) Glenmark

6) Amerigen

7) Actavis

All had side deals (one side was struck with Alkem, which is a related company with Indchemie).

Attached are the Hetero agreements.

165.    These emails demonstrate that the Bystolic Patent Litigation settlement agreements included "side deals" that, on information and belief, provided substantial additional consideration to the generics.

166.    According to Forest's Form 10-Q, filed September 30, 2013, Forest also "agreed to reimburse certain of the Settling Defendants' legal costs in connection with the patent litigation, which were not material." The Settling Defendants were Hetero, Torrent, Alkem, Indchemie, Glenmark, Amerigen, and Actavis.

167.    The $15 million payments, by themselves, were well in excess of future litigation costs. In 2015, a survey of Hatch-Waxman litigation found that the median litigation costs in cases involving risk over $25 million were a little over $8 million (a high value which fell in later years).[72] In the Bystolic Patent Litigation, only one independent claim of one patent was at issue, suggesting that costs were unlikely to be substantially greater than in a typical Hatch-Waxman case. The reverse payments here cannot be explained as reflecting avoidance of further litigation.

168.    In exchange for the payments detailed above, each Settling Generic agreed not to compete with Forest in the market for nebivolol hydrochloride until September 17, 2021, or until another generic entered the market.

---

[72] https://news.bloomberglaw.com/business-and-practice/cost-of-patent-infringement-litigation-falling-sharply

169.    The purpose and effect of the reverse-payment agreements were to delay Forest from having to face lower-priced generic competition for years.

## CAUSATION

170.    But for the anticompetitive conduct alleged above, generic nebivolol tablets would have entered the market as early as the expiration of the '580 patent: June 2, 2015. Amerigen already had final FDA approval by that date, and there were no blocking patents or exclusivities.

171.    Alkem and Indchemie would have entered as soon they obtained approval, in June and July 2015, respectively. Other generics would have entered upon approval thereafter.

172.    To the extent that Allergan would not have launched a generic under Watson's ANDA when it was approved in November 2015 because Allergan also sold brand Bystolic, Teva would have launched a generic based on Watson's ANDA as soon as Teva acquired the ANDA in August 2016.

173.    The generics would have launched at these times because, absent the offer of a reverse payment, the generic companies would not have settled the Bystolic Patent Litigation. Instead, they would have litigated to final judgment and prevailed. Because the Bystolic Patent Litigation began in March 2012, the cases would have resolved (including any appeals) before June 2015.

174.    Even if some generics settled, by virtue of the contingent launch provisions included in the settlement agreements, if any one Settling Generic had prevailed and launched generic nebivolol hydrochloride prior to September 17, 2021, then all of the other Settling Generics would have entered the market.

175.    Alternatively, the generic companies and Forest would have reached a lawful settlement based on traditional settlement factors, excluding a large, unjustified reverse payment. Without the pay-for-delay elements in the settlements, the parties would have reached an entry

date reflecting the average outcome in the litigation. Because the '040 patent was very weak and provided little or no protection by itself, the entry date would have been very soon after the expiration of the '580 patent.

176.    Instead, Defendants willfully and unlawfully maintained Defendants' monopoly power in the relevant market by engaging in a conspiracy to exclude competition and maintain supracompetitive prices for Bystolic. Defendants implemented their conspiracy via their pay-for-delay settlements of the Bystolic Patent Litigation.

177.    The only impediment to generic nebivolol tablets entering the market is Defendants' unlawful pay-for-delay settlements.

178.    Defendants' conspiracy had the purpose and effect of preventing competition to Bystolic, permitting Defendants to maintain supracompetitive prices for Bystolic, enabling Defendants to sell Bystolic without competition, and allowing Defendants to reap monopoly profits that it then shared with the generic companies via the reverse payments, to the detriment of purchasers.

## MARKET POWER AND DEFINITION

179.    As stated above, the pharmaceutical marketplace is characterized by a "disconnect" between product selection and the payment obligation. State laws prohibit pharmacists from dispensing many pharmaceutical products, including Bystolic, to patients without a prescription. The prohibition on dispensing certain products without a prescription creates this disconnect. The patient's doctor chooses which product the patient will buy while the patient (and in most cases his or her insurer) has the obligation to pay for the product.

180.    Brand manufacturers, including Defendants, exploit this price disconnect by employing large sales forces that visit doctors' offices and persuade them to prescribe the brand manufacturers' products. These sales representatives do not advise doctors of the cost of the

branded products. Studies show that doctors typically are not aware of the relative costs of brand pharmaceuticals and, even when they are aware of the relative costs, they are largely insensitive to price differences because they do not pay for the products. The result is a marketplace in which price plays a comparatively unimportant role in product selection.

181.    The relative unimportance of price in the pharmaceutical marketplace reduces what economists call the price elasticity of demand — the extent to which unit sales go down when price goes up. This lower price elasticity, in turn, gives brand manufacturers the ability to raise prices substantially above marginal cost without losing so many sales as to make the price increase unprofitable. The ability to profitably raise prices substantially above marginal costs is what economists and antitrust courts refer to as market power. The result of these pharmaceutical market imperfections and marketing practices is that brand manufacturers gain and maintain market power with respect to many branded prescription pharmaceuticals, including Bystolic.

182.    Throughout the relevant time period, Defendants have had monopoly power in the market for Bystolic because it had the power to exclude competition and/or raise or maintain the price of nebivolol hydrochloride at supra-competitive levels without losing enough sales to make supra-competitive prices unprofitable.

183.    A small but significant non-transitory increase to the price of brand Bystolic would not have caused a significant loss of sales sufficient to make the price increase unprofitable.

184.    Brand Bystolic does not exhibit significant, positive cross-elasticity of demand with respect to price with any other product for the treatment of hypertension.

185.    Brand Bystolic is differentiated from all other products currently on the market for treatment of hypertension. For example, Forest stated in the Bystolic Patent Litigation that "nebivolol has a unique pharmacological profile among beta blockers, and it lacks many of the

drawbacks typically associated with such drugs."[73]

186.   Defendants needed to control only brand Bystolic and its AB-rated generic equivalents, and no other products, in order to maintain the price of nebivolol hydrochloride profitably at supracompetitive prices. Only the market entry of competing, AB-rated generic versions would render Defendants unable to profitably maintain their prices for Bystolic without losing substantial sales.

187.   Defendants had, and exercised, the power to exclude generic competition to brand Bystolic.

188.   At all material times, high barriers to entry, including regulatory protections and high costs of entry and expansion, protected branded Bystolic from the forces of price competition.

189.   There is direct evidence of market power and anticompetitive effects available in this case sufficient to show Defendants' ability to control the price of Bystolic and generic Bystolic, and to exclude relevant competitors, without the need to show the relevant antitrust markets. The direct evidence consists of, inter alia, the following facts: (a) generic Bystolic would have entered the market at a substantial discount to brand Bystolic but for Defendants' anticompetitive conduct; (b) Defendants' gross margin on Bystolic at all relevant times was very high; and (c) Defendants never lowered the price of Bystolic to the competitive level in response to the pricing of other brand or generic drugs.

190.   To the extent proof of monopoly power by defining a relevant product market is required, Plaintiffs allege that the relevant antitrust market is the market for Bystolic and its AB-rated generic equivalents.

191.   Defendants' anticompetitive reverse payments to the Settling Generics demonstrate

---

[73] *In re Nebivolol ('040) Patent Litigation*, No. 12-cv-5026 (N.D. Ill.), ECF No. 134 at 3.

that Defendants enjoyed market and/or monopoly power with respect to nebivolol hydrochloride.

192. The United States, the District of Columbia, and the U.S. territories constitute the relevant geographic market.

193. Defendants' market share in the relevant market has been 100% at all times during the relevant time period, implying substantial monopoly power.

## MARKET EFFECTS

194. Defendants willfully and unlawfully maintained their market power by engaging in an overarching scheme to exclude competition. Defendants designed a scheme to delay competition on the products' merits, to further Defendants' anticompetitive purpose of forestalling generic competition against Bystolic, in which the Settling Generics cooperated in order to increase their own profits. Defendants carried out the scheme with the anticompetitive intent and effect of maintaining supra-competitive prices for nebivolol hydrochloride.

195. Defendants' acts and practices had the purpose and effect of restraining competition unreasonably and injuring competition by protecting brand Bystolic from competition. These actions allowed Defendants to maintain a monopoly and exclude competition in the market for Bystolic and its AB-rated generic equivalents, to the detriment of Plaintiffs and all other members of the Classes.

196. Defendants' exclusionary conduct delayed generic competition and unlawfully enabled Defendants to sell Bystolic without generic competition. Were it not for Defendants' illegal conduct, one or more generic versions of Bystolic would have entered the market sooner.

197. Competition among drug manufacturers enables all purchasers of the drug to buy drugs, including both the original drug and its subsequent competitors, at substantially lower prices. Consequently, drug manufacturers—and those that share in their profits—have a strong incentive to delay competition, and purchasers experience substantial cost inflation from that

delay.

198.    Defendants' illegal acts and conspiracy to delay generic competition for Bystolic caused Plaintiffs and all members of the Classes to pay more than they would have paid for nebivolol hydrochloride absent their illegal conduct.

199.    If generic competitors had not been unlawfully prevented from entering the market earlier and competing in the relevant markets, Plaintiffs and members of the Classes would have paid less for nebivolol hydrochloride by (a) paying lower prices on their remaining brand purchases of Bystolic, and/or (b) substituting purchases of less-expensive generic Bystolic for their purchases of more-expensive brand Bystolic.

200.    Thus, Defendants' unlawful conduct deprived Plaintiffs and members of the Classes of the benefits from the competition that the antitrust laws are designed to ensure.

## ANTITRUST IMPACT

201.    During the relevant time period, Plaintiffs and members of the Classes purchased substantial amounts of Bystolic indirectly from Defendants. As a result of Defendants' illegal conduct, Plaintiffs and the members of the Classes were compelled to pay, and did pay, artificially inflated prices for Bystolic. Those prices were substantially greater than the prices that members of the Classes would have paid absent the illegal conduct alleged herein, because: (1) the price of brand-name Bystolic was artificially inflated by Defendants' illegal conduct, and (2) members of the Classes have been deprived of the opportunity to purchase lower-priced generic versions of Bystolic. The supracompetitive prices were paid at the point of sale, which is where Plaintiffs and the Classes suffered antitrust impact.

202.    As a consequence, Plaintiffs and members of the Classes have sustained substantial damages to their business and property in the form of overcharges. The full amount and form such damages will be calculated after discovery and upon proof at trial. Commonly used and well-

accepted economic models can be used to measure both the extent and the amount of the supracompetitive charge passed through the chain of distribution to Plaintiffs and the members of the Classes.

203.    General economic theory recognizes that any overcharge at a higher level of distribution generally results in higher prices at every level below. *See* Hovenkamp, FEDERAL ANTITRUST POLICY, THE LAW OF COMPETITION AND ITS PRACTICE (1994) at 624. According to Professor Hovenkamp, "[e]very person at every stage in the chain will be poorer as a result of the monopoly price at the top."

204.    Further, the institutional structure of pricing and regulation in the pharmaceutical drug industry assures that overcharges at the higher level of distribution result in higher prices paid by members of the Classes.

205.    Defendants' anticompetitive actions enabled them to indirectly charge Plaintiffs and the Classes prices in excess of what they otherwise would have been able to charge absent their unlawful agreements described herein.

206.    The prices were inflated as a direct and foreseeable result of Defendants' anticompetitive conduct individually and with the Settling Generics.

207.    The inflated prices the Classes paid are traceable to, and the foreseeable result of, the overcharges by Defendants.

## INTERSTATE AND INTRASTATE COMMERCE

208.    During the relevant time period, Defendants used various devices to effectuate the illegal acts alleged herein, including the United States mail, interstate and foreign travel, and interstate and foreign wire commerce. All Defendants engaged in illegal activities, as charged herein, within the flow of, and substantially affecting, interstate commerce.

209. During the relevant time period, branded Bystolic, manufactured and sold by the Defendants, was shipped into each state and was sold to or paid for by Plaintiffs and members of the Classes.

210. During the relevant time period, in connection with the purchase and sale of branded Bystolic, money exchanged hands and business communications and transactions occurred in each state.

211. Defendants' conduct as set forth in this complaint had substantial effects on interstate and intrastate commerce in that, *inter alia*, distributors and retailers within each state were foreclosed from offering cheaper Bystolic and generic nebivolol hydrochloride to Plaintiffs and members of the Classes purchasing inside each state. Defendants' conduct materially deprived the consuming public—including hundreds, if not thousands, of purchasers in each state—of any choice to purchase more affordable versions of Bystolic. The absence of competition to Bystolic has, and continues to, directly and substantially affect and disrupt commerce within each state. Defendants' unlawful anticompetitive agreement has thus affected commerce in each state.

**CLAIM ACCRUAL AND/OR TOLLING**

212. Plaintiffs' complaint is timely as to all claims accruing on or after three years before the date of the filing of this complaint.

213. Plaintiffs' pre-complaint damages claims are also timely under the doctrines of equitable tolling, the discovery rule, and fraudulent concealment.

214. These doctrines apply because: (1) Defendants concealed from Plaintiffs the existence of this cause of action, (2) Plaintiffs remained in ignorance of this cause of action until on or about March 7, 2019, or later, and (3) Plaintiffs' continuing ignorance was not attributable to lack of diligence on their part.

215.     Specifically, Defendants concealed from Plaintiffs the terms of the settlements and side deals pursuant to which the Defendants paid each Settling Generic at least $15,000,000 not to launch generic Bystolic prior to September 17, 2021. To the extent that limited information about these agreements was made public prior to March 7, 2019, neither the key terms nor the value of the agreements was disclosed.

216.     Plaintiffs remained in ignorance of this cause of action until some point within three years of commencement of this action, and Plaintiffs' continuing ignorance was not attributable to a lack of diligence on its part.

217.     Specifically, Plaintiffs had insufficient knowledge of the Defendants' anticompetitive conduct to file an antitrust claim until at least March 7, 2019, when the details about the side deals alleged in this complaint were made public in the *In re Namenda* matter. Prior to that time Plaintiffs lacked any actual or constructive knowledge of evidence from which to suspect an antitrust violation had occurred.

218.     Plaintiffs and members of the Classes also lacked the facts and information necessary to form a good faith basis for believing that any legal violations had occurred. Reasonable diligence on the part of Plaintiffs and members of the Classes would not have uncovered those facts more than three years before the filing of this complaint.

219.     As a result of the Defendants' fraudulent concealment, all applicable statutes of limitations affecting the Plaintiffs' and Class members' claims have been tolled.

## CLASS ACTION ALLEGATIONS

220.     Plaintiffs bring this action on their own behalf and on behalf of all others similarly situated as a class action under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure ("Damages Class"):

All persons and entities who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price for Bystolic, other than for resale, in the States of Arizona, California, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Pennsylvania, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, Wisconsin, the District of Columbia, and Puerto Rico, at any time during the period from June 2, 2015 through and until the anticompetitive effects of Defendants' challenged conduct cease (the "Class Period").

221.    Plaintiffs bring this action on their own behalf and on behalf of all others similarly situated as a class action under Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure ("Injunctive Relief Class")

All persons and entities who purchased, paid and/or provided reimbursement for some or all of the purchase price for Bystolic, other than for resale, in the United States at any time during the period from June 2, 2015 through and until the anticompetitive effects of Defendants' challenged conduct cease (the "Class Period").

222.    Excluded from the Classes are:

a.    Defendants and their counsel, officers, directors, management, employees, subsidiaries, and affiliates;

b.    all federal governmental entities;

c.    all persons or entities who purchased Bystolic for purposes of resale or directly from Defendants or their affiliates;

d.    fully insured health plans (*i.e.*, health plans that purchased insurance from another third-party payer covering 100% of the plan's reimbursement obligations to its members);

e.    any "flat co-pay" consumers whose purchases of Bystolic were paid in part by a third-party payer and whose co-payment was the same regardless of the retail purchase price;

      f.      pharmacy benefit managers;

      g.      all counsel of record; and

      g.      all judges assigned to this case and any members of their immediate families.

223.    Members of the Classes are so numerous that joinder is impracticable. Plaintiffs believe that there are hundreds of thousands of members of the Classes, in an amount to be determined in discovery and at trial. Further, the identities of class members will be readily ascertainable through business records kept in regular order.

224.    Plaintiffs' claims are typical of the claims of members of the Classes. Plaintiffs and all members of the Classes were damaged by the same wrongful conduct by Defendants, and all paid artificially inflated prices for Bystolic and were deprived of the benefits of competition from less expensive generic versions as a result of Defendants' conduct.

225.    Plaintiffs will fairly and adequately protect and represent the interests of the Classes. Plaintiffs' interests are coincident with, and not antagonistic to, the Classes.

226.    Plaintiffs are represented by counsel who are experienced and competent in the prosecution of class action litigation, and who have particular experience with class action litigation involving the pharmaceutical industry.

227.    Questions of law and fact common to the Classes include:

      a.      whether Defendants unlawfully maintained monopoly power through all or part of its overarching scheme;

      b.      whether Defendants' anticompetitive scheme suppressed generic competition to Bystolic;

      c.      as to those parts of Defendants' challenged conduct for which such justifications may be offered, whether there exist cognizable, non-pretextual procompetitive justifications, which Defendants' challenged conduct was

the least restrictive means of achieving, that offset the harm to competition in the markets in which Bystolic is sold;

d.    whether direct proof of Defendants' monopoly power is available, and if available, whether it is sufficient to prove Defendants' monopoly power without the need to also define a relevant market;

e.    to the extent a relevant market or markets must be defined, what that definition is, or those definitions are;

f.    determination of a reasonable estimate of the amount of delay Defendants' unlawful monopolistic, unfair, and unjust conduct caused;

g.    whether Defendants' scheme, in whole or in part, has substantially affected interstate commerce;

h.    whether Defendants' scheme, in whole or in part, has substantially affected intrastate commerce;

i.    whether Defendants conspired with each of the Settling Generics to delay competition for Bystolic.

j.    whether Defendants' compensation to each Settling Generic was large and unexplained;

k.    whether Defendants' possessed the ability to control prices and/or exclude competition for Bystolic during the Class Period;

l.    Whether Defendants' unlawful monopolistic conduct was a substantial contributing factor in causing some amount of delay of the entry of AB-rated generic Bystolic;

      m.    whether Defendants' scheme, in whole or in part, caused antitrust injury to the business or property of Plaintiffs and members of the Damages in the nature of overcharges; and

      n.    the quantum of overcharges paid by the Damages Class in the aggregate.

228.    Dendants acted or refused to act on grounds that apply generally to the Classes, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Classes as a whole.

229.    Questions of law and fact common to members of the Damages Class predominate over questions, if any, that may affect only individual Damages Class members, because Defendants have acted on grounds generally applicable to the entire Damages Class. Such generally applicable conduct is inherent in Defendants' wrongful conduct.

230.    Class action treatment is a superior method for the fair and efficient adjudication of this controversy. Among other things, class treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

231.    Plaintiffs know of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## CLAIMS FOR RELIEF
## FIRST CLAIM FOR RELEIF
### For Monopolization Under State Law

232.    Plaintiffs incorporate by reference all of the allegations above as though fully set forth herein.

233.    Plaintiffs bring this claim on behalf of the Damages Class.

234.    As described above, throughout the relevant time period Defendants possessed monopoly power nationwide and in each of the state and its territories in the market for nebivolol hydrochloride. No other manufacturer sold a competing version of Bystolic during the relevant time period.

235.    At all relevant times, Defendants possessed substantial market power (*i.e.*, monopoly power) in the relevant market. Defendants possessed the power to control prices in, prevent prices from falling in, and exclude competitors from the relevant market.

236.    Through their overarching anticompetitive scheme, as alleged above, Defendants willfully maintained their monopoly power in the relevant market using restrictive or exclusionary conduct, rather than by means of greater business acumen or a historic accident, and thereby injured Plaintiffs and the Class. Defendants' anticompetitive conduct was done with the specific intent to maintain their monopoly in the market for Bystolic in the United States.

237.    Defendants knowingly and intentionally engaged in this anticompetitive scheme to monopolize the nebivolol hydrochloride market as described above. Defendants accomplished this scheme by, *inter alia*, (1) entering into illegal agreements which delayed the entry of generic Bystolic in order to lengthen the period in which Defendants' brand Bystolic could monopolize the market and make supracompetitive profits; and (2) raising and maintaining prices so that Plaintiffs and Class members would pay for Bystolic at supracompetitive prices.

238.    The goal, purpose, and effect of Defendants' scheme was to prevent and delay the sale of nebivolol hydrochloride in the United States at prices significantly below Defendants' prices for Bystolic, thereby effectively preventing the average market price of nebivolol hydrochloride from declining dramatically.

239.    The goal, purpose and effect of Defendants' scheme was also to maintain and extend its monopoly power with respect to nebivolol hydrochloride products. Defendants' illegal scheme allowed it to continue charging supracompetitive prices for nebivolol hydrochloride, without a substantial loss of sales, reaping substantial unlawful monopoly profits.

240.    Plaintiffs and members of the Damages Class purchased substantial amounts of Bystolic indirectly from Defendants.

241.    As a result of Defendants' illegal conduct, Plaintiffs and members of the Damages Class were compelled to pay, and did pay, more than they would have paid for their nebivolol hydrochloride requirements absent Defendants' illegal conduct. But for Defendants' illegal conduct, competitors would have begun selling generic Bystolic during the relevant period, and prices for nebivolol hydrochloride products would have been lower, sooner.

242.    Had manufacturers of generic Bystolic entered the market and lawfully competed with Defendants earlier, Plaintiffs and other members of the Damages Class would have substituted lower-priced generic nebivolol hydrochloride products for the higher-priced brand-name Bystolic for some or all of their nebivolol hydrochloride products requirements, and/or would have paid lower net prices on their remaining Bystolic and/or AB-rated bioequivalent purchases.

243.    By engaging in the foregoing conduct, Defendants violated the following state antitrust laws:

a.  Arizona Rev. Stat. §§ 44-1403, *et seq.*, with respect to purchases of Bystolic in Arizona by members of the Damages Class.

b.  Cal. Bus. & Prof. Code §§ 16700, with respect to purchases of Bystolic in California by members of the Damages Class.

c.  C.G.S.A. §§ 35-27, *et seq.*, with respect to purchases of Bystolic in Connecticut by members of the Damages Class.

d.  D.C. Code §§ 28-4503, *et seq.*, with respect to purchases of Bystolic in the District of Columbia by members of the Damages Class.

e.  Hawaii Rev. Stat. 480-1, *et seq.* with respect to purchases of Bystolic in Hawaii by members of the Damages Class.

f.  Illinois Antitrust Act, 740 Illinois Compiled Statutes 10/1, *et seq.*, with respect to purchases of Bystolic in Illinois by members of the Damages Class.

g.  Iowa Code §§ 553.5 *et seq.*, with respect to purchases of Bystolic and AB-rated bioequivalents in Iowa by members of the Damages Class.

h.  Kansas Stat. Ann. § 50-101 *et seq.*, with respect to purchases of Bystolic and AB-rated bioequivalents in Kansas by members of the Damages Class.

i.  Me. Rev. Stat. Ann. 10, §§ 1102, *et seq.*, with respect to purchases of Bystolic and AB-rated bioequivalents in Maine by consumer members of the Damages Class.

j.  Md. Com'l Law Code Ann. § 11-204(a), *et seq.*, with respect to purchases of Bystolic and AB-rated bioequivalents in Maryland by members of the Damages Class.

k.  Mich. Comp. Laws Ann. §§ 445.773, *et seq.*, with respect to purchases of Bystolic and AB-rated bioequivalents in Michigan by members of the Damages Class.

l.  Minn. Stat. §§ 325D.49, *et seq.*, and Minn. Stat. § 8.31, *et seq.*, with respect to purchases of Bystolic and AB-rated bioequivalents in Minnesota by members of the Damages Class.

m.  Miss. Code Ann. §§ 75-21-3, *et seq.*, with respect to purchases of Bystolic and AB-rated bioequivalents in Mississippi by members of the Damages Class.

n.  Neb. Code Ann. §§ 59-802, *et seq.*, with respect to purchases of Bystolic and AB-rated bioequivalents in Nebraska by members of the Damages Class.

o.  Nev. Rev. Stat. Ann. §§ 598A.060, *et seq.*, with respect to purchases of Bystolic and AB-rated bioequivalents in Nevada by members of the Damages Class.

p.  N.H. Rev. Stat. Ann. §§ 356.11, *et seq.*, with respect to purchases of Bystolic and AB-rated bioequivalents in New Hampshire by members of the Damages Class.

q.  N.M. Stat. Ann. §§ 57-1-2, *et seq.*, with respect to purchases of Bystolic and AB-rated bioequivalents in New Mexico by members of the Damages Class.

r.  N.Y. Gen. Bus. Law § 340, *et seq.*, with respect to purchases of Bystolic and AB-rated bioequivalents in New York by members of the Damages Class.

s.  N.C. Gen. Stat. §§ 75-2.1, *et seq.*, with respect to purchases of Bystolic and AB-rated bioequivalents in North Carolina by members of the Damages Class.

t.  N.D. Cent. Code §§ 51-08.1-03, *et seq.*, with respect to purchases of Bystolic and AB-rated bioequivalents in North Dakota by members of the Damages Class.

u.  Or. Rev. Stat. § 646.730, *et seq.*, with respect to purchases of Bystolic and AB-rated bioequivalents in Oregon by members of the Damages Class.

v.  R.I. Gen. Laws §§ 6-36-5 *et seq.*, with respect to purchases of Bystolic and AB-rated bioequivalents in Rhode Island by members of the Damages Class.

w.  S.D. Codified Laws §§ 37-1-3.2, *et seq.*, with respect to purchases of Bystolic and AB-rated bioequivalents in South Dakota by members of the Damages Class.

x.  Tenn. Code Ann. §§ 47-25-101, *et seq.*, with respect to purchases of Bystolic and AB-rated bioequivalents in Tennessee by members of the Damages Class.

y.  Utah Code Ann. §§ 76-10-911, *et seq.*, with respect to purchases of Bystolic and AB-rated bioequivalents in Utah by members of the Damages Class.

z.  Vt. Stat. Ann. 9, §§ 2453, *et seq.*, with respect to purchases of Bystolic and AB-rated bioequivalents in Vermont by consumer members of the Damages Class.

aa.  W.Va. Code §§ 47-18-4, *et seq.*, with respect to purchases of Bystolic and AB-rated bioequivalents in West Virginia by members of the Damages Class.

bb.  Wis. Stat. §§ 133.03, *et seq.*, with respect to purchases of Bystolic and AB-rated bioequivalents in Wisconsin by members of the Damages Class.

244.   Plaintiffs and members of the Damages Class have been injured in their business or property by reason of Defendants' antitrust violations alleged in this Claim. Their injuries consist of: (1) being denied the opportunity to purchase lower-priced generic nebivolol hydrochloride, and (2) paying higher prices for nebivolol hydrochloride products than they would have paid in the absence of Defendants' conduct. These injuries are of the type the antitrust laws were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

245.   Plaintiffs and the Damages Class seek damages and multiple damages as permitted by law for their injuries by Defendants' violations of the aforementioned statutes.

<u>**SECOND CLAIM FOR RELIEF**</u>
**For Conspiracy to Monopolize Under State Law**

246.   Plaintiffs incorporate by reference all of the allegations above as though fully set forth herein.

247.    Plaintiffs bring this claim on behalf of the Damages Class.

248.    As described above, throughout the relevant time period Defendants have possessed monopoly power nationwide and in each of the United States in the market for nebivolol hydrochloride. No other manufacturer sold a competing version of Bystolic during the relevant time period.

249.    Defendants willfully and unlawfully engaged in a continuing illegal conspiracy (or conspiracies) with the Settling Generics to monopolize the nebivolol hydrochloride market by engaging in an anticompetitive scheme to keep generic equivalents from the market—not as a result of providing a superior product, business acumen, or historical accident.

250.    Defendants knowingly and intentionally conspired to monopolize the Bystolic and AB-rated bioequivalent nebivolol hydrochloride products market as described above. Defendants accomplished this scheme by, among other things, (1) entering into illegal agreements that delayed the entry of generic Bystolic in order to lengthen the period in which Defendants' brand Bystolic could monopolize the market and make supracompetitive profits; (2) raising and maintaining prices so that Plaintiffs and Damages Class members would pay for Bystolic at supracompetitive prices; and (3) otherwise conspiring to unlawfully monopolize and conspire to monopolize the market for nebivolol hydrochloride.

251.    The goal, purpose, and effect of Defendants' scheme was to prevent and delay the sale of nebivolol hydrochloride products in the United States and its territories at prices significantly below Defendants' prices for Bystolic, thereby effectively preventing the price of nebivolol hydrochloride products from declining dramatically while maintaining and extending its monopoly power with respect to nebivolol hydrochloride products.

252.    Plaintiffs and members of the Damages Class purchased substantial amounts of Bystolic and/or AB-rated generic equivalents indirectly from Defendants and/or other manufacturers.

253.    As a result of Defendants' illegal conduct, Plaintiffs and members of the Damages Class were compelled to pay, and did pay, more than they would have paid for their nebivolol hydrochloride requirements absent Defendants' illegal conduct. But for Defendants' illegal conduct, competitors would have begun selling generic Bystolic sooner than they did, and prices for nebivolol hydrochloride products would have been lower, sooner.

254.    Had manufacturers of generic nebivolol hydrochloride entered the market and lawfully competed with Defendants earlier, Plaintiffs and members of the Damages Class would have substituted lower-priced generic nebivolol hydrochloride products for the higher-priced brand-name Bystolic for some or all of their nebivolol hydrochloride products requirements, and/or would have paid lower net prices on their remaining Bystolic and/or AB-rated bioequivalent purchases.

255.    But for Defendants' illegal conduct, competitors would have begun marketing generic versions of Bystolic during the relevant period, and they would have been able to market such versions more successfully.

256.    By engaging in the foregoing conduct, Defendants violated the following state antitrust laws:

a.    Arizona Rev. Stat. §§ 44-1402, *et seq.*, with respect to purchases of Bystolic and AB-rated bioequivalents in Arizona by members of the Damages Class.

b.    Cal. Bus. & Prof. Code §§ 16700, *et seq.*, with respect to purchases of Bystolic and AB-rated bioequivalents in California by members of the Damages Class.

c. C.G.S.A. §§ 35-27, *et seq.*, with respect to purchases of Bystolic in Connecticut by members of the Damages Class.

d. D.C. Code §§ 28-4503, *et seq.*, with respect to purchases of Bystolic and AB-rated bioequivalents in the District of Columbia by members of the Damages Class.

e. Hawaii Rev. Stat. 480-1, *et seq.*, with respect to purchases of Bystolic and AB-rated bioequivalents in Hawaii by members of the Damages Class.

f. Illinois Antitrust Act, 740 Illinois Compiled Statutes 10/1, *et seq.*, with respect to purchases of Bystolic and AB-rated bioequivalents in Illinois by members of the Damages Class.

g. Iowa Code §§ 535.5, *et seq.*, with respect to purchases of Bystolic and AB-rated bioequivalents in Iowa by members of the Damages Class.

h. Kan. Stat. Ann. §§ 50-101, *et seq.*, with respect to purchases of Bystolic and AB-rated bioequivalents in Kansas by members of the Damages Class.

i. Me. Rev. Stat. Ann. 10, §§ 1102, *et seq.*, with respect to purchases of Bystolic and AB-rated bioequivalents in Maine by consumer members of the Damages Class.

j. Md. Com'l Law Code Ann. § 11-204(a), *et seq.*, with respect to purchases of Bystolic and AB-rated bioequivalents in Maryland by members of the Damages Class.

k. Mich. Comp. Laws Ann. §§ 445.772, *et seq.*, with respect to purchases of Bystolic and AB-rated bioequivalents in Michigan by members of the Damages Class.

l.  Minn. Stat. §§ 325D.49, *et seq.*, and Minn. Stat. § 8.31, *et seq.*, with respect to purchases of Bystolic and AB-rated bioequivalents in Minnesota by members of the Damages Class.

m.  Miss. Code Ann. §§ 75-21-3, *et seq.*, with respect to purchases of Bystolic and AB-rated bioequivalents in Mississippi by members of the Damages Class.

n.  Neb. Code Ann. §§ 59-802, *et seq.*, with respect to purchases of Bystolic and AB-rated bioequivalents in Nebraska by members of the Damages Class.

o.  Nev. Rev. Stat. Ann. §§ 598A.060, *et seq.*, with respect to purchases of Bystolic and AB-rated bioequivalents in Nevada by members of the Damages Class.

p.  N.H. Rev. Stat. Ann. §§ 356.11, *et seq.*, with respect to purchases of Bystolic and AB-rated bioequivalents in New Hampshire by members of the Damages Class.

q.  N.M. Stat. Ann. §§ 57-1-2, *et seq.*, with respect to purchases of Bystolic and AB-rated bioequivalents in New Mexico by members of the Damages Class.

r.  N.Y. Gen. Bus. Law §§ 340, *et seq.*, with respect to purchases of Bystolic and AB-rated bioequivalents in New York by members of the Damages Class.

s.  N.C. Gen. Stat. §§ 75-2.1, *et seq.*, with respect to purchases of Bystolic and AB-rated bioequivalents in North Carolina by members of the Damages Class.

t.  N.D. Cent. Code §§ 51-08.1-02, *et seq.*, with respect to purchases of Bystolic and AB-rated bioequivalents in North Dakota by members of the Damages Class.

u.  Or. Rev. Stat. § 646.730, *et seq.*, with respect to purchases of Bystolic and AB-rated bioequivalents in Oregon by members of the Damages Class.

v.   R.I. Gen. Laws §§ 6-36-5 *et seq*., with respect to purchases of Bystolic and AB-rated bioequivalents in Rhode Island by members of the Damages Class.

w.   S.D. Codified Laws Ann. §§ 37-1-3.2, *et seq.*, with respect to purchases of Bystolic and AB-rated bioequivalents in South Dakota by members of the Damages Class.

x.   Tenn. Code Ann. §§ 47-25-101, *et seq.*, with respect to purchases of Bystolic and AB-rated bioequivalents in Tennessee by members of the Damages Class.

y.   Utah Code Ann. §§ 76-10-911, *et seq*., with respect to purchases of Bystolic and AB-rated bioequivalents in Utah by members of the Damages Class.

z.   Vt. Stat. Ann. 9, §§ 2453, *et seq*., with respect to purchases of Bystolic and AB-rated bioequivalents in Vermont by consumer members of the Damages Class.

aa.   W.Va. Code §§ 47-18-3, *et seq.*, with respect to purchases of Bystolic and AB-rated bioequivalents in West Virginia by members of the Damages Class.

bb.   Wis. Stat. §§ 133.03, *et seq.*, with respect to purchases of Bystolic and AB-rated bioequivalents in Wisconsin by members of the Damages Class.

257.   Plaintiffs and members of the Damages Class have been injured in their business or property by reason of Defendants' antitrust violations alleged in this claim. Their injuries consist of: (1) being denied the opportunity to purchase lower-priced generic nebivolol hydrochloride products, and (2) paying higher prices for nebivolol hydrochloride products than they would have paid in the absence of Defendants' conduct. These injuries are of the type the antitrust laws were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

258.   Plaintiffs and the Damages Class seek damages and multiple damages as permitted by law for their injuries by Defendants' violations of the aforementioned statutes.

### THIRD CLAIM FOR RELIEF
**Combination and Conspiracy in Restraint of Trade**

259.    Plaintiffs incorporate by reference all of the allegations above as though fully set forth herein.

260.    Plaintiffs bring this claim on behalf of the Damages Class.

261.    Defendants willfully and unlawfully engaged in a continuing illegal contract, combination, and conspiracy with the Settling Generics to restrain trade in the nebivolol hydrochloride market by engaging in an anticompetitive scheme to keep generic equivalents from the market.

262.    Defendants accomplished this scheme by, among other things, (1) entering into illegal agreements which delayed the entry of generic Bystolic in order to lengthen the period in which brand Bystolic could monopolize the market and make supracompetitive profits; and (2) raising and maintaining prices so that Plaintiffs and Damages Class members would pay for Bystolic at supracompetitive prices.

263.    The settlement agreements and side deals between Defendants and the Settling Generics are presumptively anticompetitive reverse payment settlements, subject to "quick look" rule of reason scrutiny, because Defendants provided substantial consideration in exchange for each generic manufacturer's agreement to delay market entrance.

264.    Through the agreements, Defendants and the Settling Generics joined in an anticompetitive scheme as co-conspirators. The agreements are and were a contract, combination and/or conspiracy that substantially, unreasonably, and unduly restrained trade in the relevant market, the purpose and effect of which was to: (a) allocate all sales of nebivolol hydrochloride in the United States and its territories to Defendants until September 17, 2021; (b) prevent the sale of any generic version of nebivolol hydrochloride in the United States and its territories until

September 17, 2021; and (c) fix the price at which Plaintiffs and all members of the Damages Class would pay for nebivolol hydrochloride.

265.    On information and belief, Defendants paid the Settling Generics financial inducements through large and unexplained payments that vastly exceed the cost of avoided litigation and are not otherwise explained by the value of any services provided by the Settling Generics to Defendants (other than the Settling Defendants' agreement to delay launching their generic Bystolics). There are no valid, non-pretextual procompetitive business justifications for the agreements, nor for the payments to the Settling Generics under the agreements. Even if there were some conceivable justification, the agreements, and the payments flowing to the Settling Generics under the agreements, were not reasonably necessary to achieve it.

266.    In exchange for these payments, the Settling Generics agreed to, and did, delay introduction of their generic Bystolic in the United States.

267.    The goal, purpose, and effect of Defendants' scheme was to prevent and delay the sale of nebivolol hydrochloride products in the United States and its territories at prices significantly below Defendants' prices for Bystolic, thereby effectively preventing the average market price of nebivolol hydrochloride products from declining dramatically.

268.    The goal, purpose and effect of Defendants' scheme was also to maintain and extend Defendants' monopoly power with respect to nebivolol hydrochloride. The illegal scheme allowed Defendants to continue charging supracompetitive prices for nebivolol hydrochloride products, without a substantial loss of sales, reaping substantial unlawful monopoly profits.

269.    Plaintiffs and members of the Damages Class purchased substantial amounts of Bystolic indirectly from Defendants.

270.    As a result of Defendants' illegal conduct, Plaintiffs and members of the Damages Class were compelled to pay, and did pay, more than they would have paid for their nebivolol hydrochloride requirements absent Defendants' illegal conduct. But for Defendants' illegal conduct, competitors would have begun selling generic Bystolic sooner than they did, and prices for nebivolol hydrochloride products would have been lower, sooner.

271.    By engaging in the foregoing conduct, Defendants intentionally and wrongfully engaged in a combination and conspiracy in restraint of trade in violation of the following state antitrust laws:

a.  Arizona Rev. Stat. §§ 44-1402, *et seq.*, with respect to purchases of Bystolic in Arizona by members of the Damages Class.

b.  Cal. Bus. & Prof. Code §§ 16700, *et seq.*, with respect to purchases of Bystolic in California by members of the Damages Class.

c.  C.G.S.A. §§ 35-26 and 28, et seq., with respect to purchases of Bystolic in Connecticut by members of the Damages Class.

d.  D.C. Code §§ 28-4502, *et seq.*, with respect to purchases of Bystolic in the District of Columbia by members of the Damages Class.

e.  Hawaii Revised Statutes annotated § 480-1, *et seq.*, with respect to purchases of Bystolic in Hawaii by members of the Damages Class.

f.  740 Illinois Compiled Statutes 10/1, *et seq.*, with respect to purchases of Bystolic in Illinois by members of the Damages Class.

g.  Iowa Code § 553.4, *et seq.*, with respect to purchases of Bystolic in Iowa by members of the Damages Class.

h.   Kan. Stat. Ann. §§ 50-101, *et seq.*, with respect to purchases of Bystolic in Kansas by members of the Damages Class.

i.   Me. Rev. Stat. Ann. 10, §§ 1101, *et seq.*, with respect to purchases of Bystolic in Maine by consumer members of the Damages Class.

j.   Md. Com'l Law Code Ann. § 11-204(a), *et seq.*, with respect to purchases of Bystolic in Maryland by members of the Damages Class.

k.   Mich. Comp. Laws Ann. §§ 445.772, *et seq.*, with respect to purchases of Bystolic in Michigan by members of the Damages Class.

l.   Minn. Stat. §§ 325D.51, *et seq.*, and Minn. Stat. §§ 8.31, *et seq.*, with respect to purchases of Bystolic in Minnesota by members of the Damages Class.

m.   Miss. Code Ann. §§ 75-21-3, *et seq.*, with respect to purchases of Bystolic in Mississippi by members of the Damages Class.

n.   Neb. Code Ann. §§ 59-801, *et seq.*, with respect to purchases of Bystolic in Nebraska by members of the Damages Class.

o.   Nev. Rev. Stat. Ann. §§ 598A.060, *et seq.*, with respect to purchases of Bystolic in Nevada by members of the Damages Class.

p.   N.H. Revised Statutes § 356:1, *et seq.*, with respect to purchases of Bystolic in New Hampshire by members of the Damages Class.

q.   N.M. Stat. Ann. §§ 57-1-1, *et seq.*, with respect to purchases of Bystolic in New Mexico by members of the Damages Class.

r.   N.Y. Gen. Bus. Law §§ 340, *et seq.*, with respect to purchases of Bystolic in New York by members of the Damages Class.

s.  N.C. Gen. Stat. §§ 75-1, *et seq.*, with respect to purchases of Bystolic in North Carolina by members of the Damages Class.

t.  N.D. Cent. Code §§ 51-08.1-02, *et seq.*, with respect to purchases of Bystolic in North Dakota by members of the Damages Class.

u.  Or. Rev. Stat. § 646.725, *et seq.*, with respect to purchases of Bystolic in Oregon by members of the Damages Class.

v.  R.I. Gen. Laws § 6-36-4, et seq., with respect to purchases of Bystolic in Rhode Island by members of the Damages Class.

w.  S.D. Codified Laws Ann. §§ 37-1-3.1, *et seq.*, with respect to purchases of Bystolic in South Dakota by members of the Damages Class.

x.  Tenn. Code Ann. §§ 47-25-101, *et seq.*, with respect to purchases of Bystolic in Tennessee by members of the Damages Class.

y.  Utah Code Annotated § 76-10-3103, *et seq.*, with respect to purchases of Bystolic in Utah by members of the Damages Class.

z.  Vt. Stat. Ann. 9, §§ 2453, *et seq.*, with respect to purchases of Bystolic in Vermont by consumer members of the Damages Class.

aa.  W.Va. Code §§ 47-18-3, *et seq.*, with respect to purchases of Bystolic in West Virginia by members of the Damages Class.

bb.  Wis. Stat. §§ 133.03, *et seq.*, with respect to purchases of Bystolic in Wisconsin by members of the Damages Class.

272.  Plaintiffs and members of the Damages Class have been injured in their business or property by reason of Defendants' antitrust violations alleged in this Claim. Their injuries consist of: (1) being denied the opportunity to purchase lower-priced nebivolol hydrochloride

generic products, and (2) paying higher prices for nebivolol hydrochloride products than they would have paid in the absence of Defendants' conduct. These injuries are of the type the antitrust laws were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

273.    Plaintiffs and the Damages Class seek damages and multiple damages as permitted by law for their injuries by Defendants' violation of the aforementioned statutes.

**FOURTH CLAIM FOR RELIEF**
**Unfair or Deceptive Trade Practices**

274.    Plaintiff incorporates by reference all of the allegations above as though fully set forth herein.

275.    Plaintiffs bring this claim on behalf of the Damages Class.

276.    Defendants engaged in unfair competition, and/or unfair/unconscionable, and/or deceptive acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Defendants' anticompetitive, deceptive, unfair and/or unconscionable acts or practices, Plaintiffs and Damages Class members were deprived of the opportunity to purchase a less expensive AB-rated bioequivalent of nebivolol hydrochloride and forced to pay higher prices in violation of the following consumer protection statutes:

      a. Alaska Stat. Ann. § 45.50.471, et seq., with respect to purchases in Alaska by members of the Damages Class. Defendants engaged in unfair methods of competition and unfair practices in the conduct of trade and commerce.

      b. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California by members of the Damages Class. Defendants engaged in business practices that are unfair in that they are immoral, unethical, oppressive, unscrupulous, and substantially injurious to Damages Class members. There are no countervailing

benefits to Damages Class members and any utility of defendants' conduct is outweighed by the consequences to Damages Class members.

c.  Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida by members of the Damages Class.

d.  Mo. Rev. Stat. §§ 407.020 et seq., with respect to purchase in Missouri by consumer members of the Damages Class.

e.  Mont. Code Ann. §§ 30-14-101, et seq., with respect to purchases in Montana by consumer members of the Damages Class. Defendants engaged in unfair and deceptive acts and practices.

f.  S.C. Code Ann. §§ 39-5-20, et seq., with respect to purchases in South Carolina by Damages Class members. Defendants engaged in unfair methods of competition and unfair practices in the conduct of trade and commerce. Defendants' conduct is offensive to public policy and immoral, unethical, and oppressive.

g.  Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont by consumer members of the Damages Class. Defendants engaged in unfair methods of competition, unfair practices, and deceptive practices in the conduct of trade and commerce.

277.   Plaintiffs and members of the Damages Class have been injured in their business and property by reason of Defendants' anticompetitive, unfair/unconscionable and/or deceptive acts or practices alleged in this Count. Their injury consists of paying higher prices for Bystolic and/or AB-rated generic bioequivalents than they would have paid in the absence of these

violations. This injury is of the type the state consumer protection statutes were designed to prevent and directly results from Defendants' unlawful conduct.

## FIFTH CLAIM FOR RELIEF
### Unjust Enrichment Under State Law

278.    Plaintiffs incorporate by reference all of the allegations above as though fully set forth herein.

279.    Plaintiffs bring this claim on behalf of the Damages Class.

280.    To the extent required, this claim is pleaded in the alternative to the other claims in this complaint.

281.    As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched. Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on Bystolic.

282.    Defendants' financial benefits are traceable to Plaintiffs' and Damages Class members' overpayments for Bystolic.

283.    Plaintiffs and Damages Class members have conferred and continue to confer an economic benefit upon Defendants in the nature of profits resulting from the unlawful overcharges described herein, to the economic detriment of Plaintiffs and Damages Class members.

284.    Defendants have benefited from their unlawful acts and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiffs and the members of the Damages Class for Bystolic manufactured by Defendants during the Class Period.

285.    It would be futile for Plaintiffs and Damages Class members to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly

purchased Bystolic, as those intermediaries are not liable and would not compensate Plaintiffs and Damages Class members for Defendants' unlawful conduct.

286.    The economic benefit Defendants derived from overcharging Plaintiffs and Damages Class members for Bystolic is a direct and proximate result of Defendants' unlawful and anticompetitive practices.

287.    The financial benefits Defendants derived are ill-gotten gains that rightfully belong to Plaintiffs and Damages Class members, who paid and continue to pay artificially inflated prices that inured to Defendants' benefit.

288.    It would be inequitable under unjust enrichment principles under the laws of the states described below for Defendants to retain any of the overcharges Plaintiffs and Damages Class members paid for Bystolic that were derived from Defendants' unfair, anticompetitive and unlawful methods, acts and trade practices.

289.    Defendants are aware of and appreciate the benefits that Plaintiffs and the Damages Class members have bestowed upon them.

290.    Defendants should be ordered to disgorge all unlawful or inequitable proceeds they received in a common fund for the benefit of Plaintiffs and Damages Class members, who collectively have no adequate remedy at law.

291.    A constructive trust should be imposed upon all unlawful or inequitable sums Defendants received, which arise from overpayments for branded and generic versions of Bystolic by Plaintiffs and the Damages Class members.

292.    Plaintiffs and Damages Class members have no adequate remedy at law.

293.    By engaging in the foregoing unlawful or inequitable conduct, which deprived Plaintiffs and the Damages Class members of the opportunity to purchase lower-priced generic

versions of Bystolic and forced them to pay higher prices for branded and generic versions of Bystolic, Defendants have been unjustly enriched in violation of the common law of various states and commonwealths, as outlined below:

**Alabama**

294.    Defendants unlawfully overcharged end-payers who made purchases of or reimbursements for branded and generic versions of Bystolic in Alabama at prices that were more than they would have been but for Defendants' actions.

295.    Plaintiffs and Damages Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and Damages Class members.

296.    Defendants accepted and retained the benefits bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to Plaintiffs and Damages Class members.

297.    Defendants have benefitted at the expense of Plaintiffs and Damages Class members from revenue resulting from unlawful overcharges for branded and generic versions of Bystolic.

**Arizona**

298.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Bystolic in Arizona at prices that were more than they would have been but for Defendants' actions.

299.    Defendants have been enriched by revenue resulting from unlawful overcharges for branded and generic versions of Bystolic.

300.     Plaintiffs have been impoverished by the overcharges for branded and generic versions of Bystolic resulting from Defendants' unlawful conduct.

301.     Defendants' enrichment and Plaintiffs' impoverishment are connected. Defendants have paid no consideration to any other person for any benefits they received from Plaintiffs and Damages Class Members.

302.     There is no justification for Defendants' receipt of the benefits causing their enrichment and Plaintiffs' impoverishment, because Plaintiffs paid anticompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.

303.     Plaintiffs and Damages Class members have no remedy at law.

**California**

304.     Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Bystolic in California at prices that were more than they would have been but for Defendants' actions.

305.     Plaintiffs and Damages Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and Class members.

306.     Defendants retained the benefits bestowed upon them under inequitable and unjust circumstances at the expense of Plaintiffs and Damages Class members.

**Florida**

307.     Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Bystolic in Florida at prices that were more than they would have been but for Defendants' actions.

308.    Plaintiffs and the Damages Class Members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class members.

309.    Defendants appreciated the benefits bestowed upon them by Plaintiffs and the Damages Class members.

310.    It is inequitable for Defendants to accept and retain the benefits received without compensating Plaintiffs and the Damages Class members.

**Hawaii**

311.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Bystolic in Hawaii at prices that were more than they would have been but for Defendants' actions.

312.    Plaintiffs and Damages Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and Class members.

313.    It is unjust for Defendants to retain the benefits received without compensating Plaintiffs and Damages Class members.

**Illinois**

314.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Bystolic in Illinois at prices that were more than they would have been but for Defendants' actions.

315.    Plaintiffs and Damages Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and Damages Class members.

316.    Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to Plaintiffs and Damages Class members.

317.    It is unjust and inequitable for Defendants to retain the benefits received without compensating Plaintiffs and Damages Class members.

**Iowa**

318.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Bystolic in Iowa at prices that were more than they would have been but for Defendants' actions.

319.    Defendants have been enriched by revenue resulting from unlawful overcharges for branded and generic versions of Bystolic, which revenue resulted from anticompetitive prices paid by Plaintiffs, which inured to Defendants' benefit.

320.    Defendants' enrichment has occurred at the expense of Plaintiffs and Damages Class members.

321.    It is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

**Kansas**

322.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Bystolic in Kansas at prices that were more than they would have been but for Defendants' actions.

323.    Plaintiffs and Damages Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and Damages Class members.

324.    Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to Plaintiffs and Damages Class members.

325.    Defendants were unjustly enriched at the expense of Plaintiffs and Damages Class members.

**Maine**

326.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Bystolic in Maine at prices that were more than they would have been but for Defendants' actions.

327.    Plaintiffs and Damages Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and Damages Class members.

328.    Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to Plaintiffs and Damages Class members.

329.    Defendants were aware of and appreciated the benefit bestowed upon them by Plaintiffs and Damages Class members.

330.    Defendants were unjustly enriched at the expense of Plaintiffs and Damages Class members.

**Massachusetts**

331.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Bystolic in Massachusetts at prices that were more than they would have been but for Defendants' actions.

332.    Plaintiffs and Damages Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and Damages Class members.

333.    Defendants were aware of or appreciated the benefit conferred upon them by Plaintiffs and Damages Class members.

334.    Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and Damages Class members. Fairness and good conscience require that Defendants not be permitted to retain the revenue resulting from their unlawful overcharges at the expense of Plaintiffs and Damages Class members.

**Michigan**

335.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Bystolic in Michigan at prices that were more than they would have been but for Defendants' actions.

336.    Plaintiffs and Damages Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and Damages Class members.

337.    Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to Plaintiffs and Damages Class members.

338.    Defendants were unjustly enriched at the expense of Plaintiffs and Damages Class members.

**Minnesota**

339.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Bystolic in Minnesota at prices that were more than they would have been but for Defendants' actions.

340.    Defendants appreciated and knowingly accepted the benefits bestowed upon them by Plaintiffs and Damages Class members. Defendants have paid no consideration to any other person for any of the benefits they have received from Plaintiffs and Damages Class members.

341.    It is inequitable for Defendants to accept and retain the benefits received without compensating Plaintiffs and Damages Class members.

**Mississippi**

342.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Bystolic in Mississippi at prices that were more than they would have been but for Defendants' actions.

343.    Defendants retain the benefit of overcharges received on the sales of branded and generic versions of Bystolic, which in equity and good conscience belong to Plaintiffs and Damages Class members on account of Defendants' anticompetitive conduct.

**Missouri**

344.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Bystolic in Missouri at prices that were more than they would have been but for Defendants' actions.

345.    Plaintiffs and Damages Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and Damages Class members.

346.    Defendants appreciated the benefit bestowed upon them by Plaintiffs and Damages Class members.

347.    Defendants accepted and retained the benefit bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to Plaintiffs and Damages Class members.

**Nebraska**

348.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Bystolic in Nebraska at prices that were more than they would have been but for Defendants' actions.

349.    Defendants received money from Plaintiffs and Damages Class members as a direct result of the unlawful overcharges, and have retained this money. Defendants have paid no consideration to any other person in exchange for this money.

350.    In justice and fairness, Defendants should disgorge such money and remit the overcharged payments back to Plaintiffs and Damages Class members.

**Nevada**

351.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Bystolic in Nevada at prices that were more than they would have been but for Defendants' actions.

352.    Plaintiffs and Damages Class members have conferred an economic benefit upon Defendants in the nature of revenue resulting from unlawful overcharges for branded and generic versions of Bystolic.

353.    Defendants appreciated the benefits bestowed upon them by Plaintiffs and Damages Class members, for which they have paid no consideration to any other person.

354.    Defendants have knowingly accepted and retained the benefits bestowed upon them by Plaintiffs and Damages Class members.

355.    The circumstances under which Defendants have accepted and retained the benefits bestowed upon them by Plaintiffs and Damages Class members are inequitable in that they result from Defendants' unlawful overcharges for branded and generic versions of Bystolic.

**New Hampshire**

356.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Bystolic in New Hampshire at prices that were more than they would have been but for Defendants' actions.

357.    Defendants have received a benefit from Plaintiffs in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants.

358.    Under the circumstances, it would be unconscionable for Defendants to retain such benefits.

**New Mexico**

359.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Bystolic in New Mexico at prices that were more than they would have been but for Defendants' actions.

360.    Defendants have knowingly benefitted at the expense of Plaintiffs and Damages Class members from revenue resulting from unlawful overcharges for branded and generic versions of Bystolic.

361.   To allow Defendants to retain the benefits would be unjust because the benefits resulted from anticompetitive pricing that inured to Defendants' benefit and because Defendants have paid no consideration to any other person for any of the benefits they received.

**New York**

362.   Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Bystolic in New York at prices that were more than they would have been but for Defendants' actions.

363.   Defendants have been enriched by revenue resulting from unlawful overcharges for branded and generic versions of Bystolic, which revenue resulted from anticompetitive prices paid by Plaintiffs, which inured to Defendants' benefit.

364.   Defendants' enrichment has occurred at the expense of Plaintiffs and Damages Class members.

365.   It is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

**North Carolina**

366.   Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Bystolic in North Carolina at prices that were more than they would have been but for Defendants' actions.

367.   Plaintiffs and Damages Class Members have conferred an economic benefit upon Defendants in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and Damages Class members.

368.   Plaintiffs did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.

369.    The benefits conferred upon Defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from Defendants' actions to delay entry of generic versions of Bystolic to the market.

370.    The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to unlawful overcharges are ascertainable by review of sales records and pay-for-delay agreements themselves.

371.    Defendants consciously accepted the benefits and continue to do so as of the date of this filing.

**North Dakota**

372.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Bystolic in North Dakota at prices that were more than they would have been but for Defendants' actions.

373.    Defendants have been enriched by revenue resulting from unlawful overcharges for branded and generic versions of Bystolic.

374.    Plaintiffs have been impoverished by the overcharges for branded and generic versions of Bystolic resulting from Defendants' unlawful conduct.

375.    Defendants' enrichment and Plaintiffs' impoverishment are connected. Defendants have paid no consideration to any other person for any benefits they received directly or indirectly from Plaintiffs and Damages Class members.

376.    There is no justification for Defendants' receipt of the benefits causing their enrichment, because Plaintiffs paid anticompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.

377.    Plaintiffs and Damages Class members have no remedy at law.

**Oregon**

378.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Bystolic in Oregon at prices that were more than they would have been but for Defendants' actions.

379.    Plaintiffs and Damages Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and Damages Class members.

380.    Defendants were aware of the benefit bestowed upon them by Plaintiffs and Damages Class members.

381.    It would be inequitable and unjust for Defendants to retain any of the overcharges for Bystolic derived from Defendants' unfair conduct without compensating Plaintiffs and Class members.

**Pennsylvania**

382.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Bystolic in Pennsylvania at prices that were more than they would have been but for Defendants' actions.

383.    Plaintiffs and Damages Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and Damages Class members.

384.    Defendants appreciated the benefit bestowed upon them by Plaintiffs and Damages Class members.

385.    Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and Damages Class members.

**Rhode Island**

386.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Bystolic in Rhode Island at prices that were more than they would have been but for Defendants' actions.

387.    Plaintiffs and Damages Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and Damages Class members.

388.    Defendants were aware of and/or recognized the benefit bestowed upon them by Plaintiffs and the Damages Class members.

389.    Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and Damages Class members.

**South Dakota**

390.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Bystolic in South Dakota at prices that were more than they would have been but for Defendants' actions.

391.    Plaintiffs and Damages Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and Damages Class members.

392.    Defendants were aware of the benefit bestowed upon them by Plaintiffs and Damages Class members.

393.    Under the circumstances, it would be inequitable and unjust for Defendants to retain such benefits without reimbursing Plaintiffs and Damages Class members.

**Tennessee**

394.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Bystolic in Tennessee at prices that were more than they would have been but for Defendants' actions.

395.    Plaintiffs and Damages Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and Damages Class members.

396.    Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and Damages Class members.

397.    Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and Damages Class members.

398.    It would be futile for Plaintiffs and Damages Class members to exhaust all remedies against the entities with which Plaintiffs and Damages Class members have privity of contract because Plaintiffs and Damages Class members did not purchase branded or generic versions of Bystolic directly from any Defendant.

**Utah**

399.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Bystolic in Utah at prices that were more than they would have been but for Defendants' actions.

400.    Plaintiffs and Damages Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and Damages Class members.

401.    Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and Damages Class members.

402.    Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and Damages Class members.

**Vermont**

403.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Bystolic in Vermont at prices that were more than they would have been but for Defendants' actions.

404.    Plaintiffs and Damages Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and Damages Class members.

405.    Defendants accepted the benefit bestowed upon them by Plaintiffs and Damages Class members.

406.    Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and Damages Class members.

**West Virginia**

407.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Bystolic in West Virginia at prices that were more than they would have been but for Defendants' actions.

408.    Plaintiffs and Damages Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and Damages Class members.

409.    Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and Damages Class members.

410.    Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and Damages Class members.

**Wisconsin**

411.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Bystolic in Wisconsin at prices that were more than they would have been but for Defendants' actions.

412.    Plaintiffs and Damages Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and Damages Class members.

413.    Defendants appreciated the benefit bestowed upon them by Plaintiffs and Damages Class members.

414.    Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and Damages Class members.

**District of Columbia**

415.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Bystolic in the District of Columbia at prices that were more than they would have been but for Defendants' actions.

416.    Plaintiffs and Damages Class members have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and Damages Class members.

417.    Defendants accepted and retained the benefit bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to Plaintiffs and Damages Class members.

418.    Under the circumstances, it would be inequitable and unjust for Defendants to retain such benefits.

**Puerto Rico**

419.    Defendants unlawfully overcharged end-payers, who made purchases of or reimbursements for branded and generic versions of Bystolic in Puerto Rico at prices that were more than they would have been but for Defendants' actions.

420.    Defendants have been enriched by revenue resulting from unlawful overcharges for branded and generic versions of Bystolic.

421.    Plaintiffs have been impoverished by the overcharges for branded and generic versions of Bystolic resulting from Defendants' unlawful conduct.

422.    Defendants' enrichment and Plaintiffs' impoverishment are connected.

423.    There is no justification for Defendants' receipt of the benefits causing their enrichment and Plaintiffs' impoverishment, because Plaintiffs paid anticompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.

424.    Plaintiffs and Damages Class members have no remedy at law.

## SIXTH CLAIM FOR RELIEF
### Violation of Section 2 of the Sherman Act: Monopolization

425.    Plaintiffs incorporate by reference all of the allegations above as though fully set forth herein.

426.    Plaintiffs bring this claim on behalf of the Injunctive Relief Class.

427.    As described above, throughout the relevant time period Defendants possessed monopoly power nationwide and in each of the state and its territories in the market for nebivolol hydrochloride. No other manufacturer sold a competing version of Bystolic during the relevant time period.

428.    At all relevant times, Defendants possessed substantial market power (*i.e.*, monopoly power) in the relevant market. Defendants possessed the power to control prices in, prevent prices from falling in, and exclude competitors from the relevant market.

429.    Through their overarching anticompetitive scheme, as alleged above, Defendants willfully maintained their monopoly power in the relevant market using restrictive or exclusionary conduct, rather than by means of greater business acumen or a historic accident, and thereby injured Plaintiffs and the Injunctive Relief Class. Defendants' anticompetitive conduct was done with the specific intent to maintain their monopoly in the market for Bystolic in the United States.

430.    Defendants knowingly and intentionally engaged in this anticompetitive scheme to monopolize the nebivolol hydrochloride market as described above. Defendants accomplished this scheme by, *inter alia*, (1) entering into illegal agreements which delayed the entry of generic Bystolic in order to lengthen the period in which Defendants' brand Bystolic could monopolize the market and make supracompetitive profits; and (2) raising and maintaining prices so that Plaintiffs and Injunctive Relief Class members would pay for Bystolic at supracompetitive prices.

431.    The goal, purpose, and effect of Defendants' scheme was to prevent and delay the sale of nebivolol hydrochloride in the United States at prices significantly below Defendants' prices for Bystolic, thereby effectively preventing the average market price of nebivolol hydrochloride from declining dramatically while maintaining and extending its monopoly power with respect to nebivolol hydrochloride products.

432.    Plaintiffs and members of the Injunctive Relief Class purchased substantial amounts of Bystolic indirectly from Defendants.

433.    As a result of Defendants' illegal conduct, Plaintiffs and members of the Injunctive Relief Class were compelled to pay, and did pay, more than they would have paid for their nebivolol hydrochloride requirements absent Defendants' illegal conduct. But for Defendants' illegal conduct, competitors would have begun selling generic Bystolic during the relevant period, and prices for nebivolol hydrochloride products would have been lower, sooner.

434.    Had manufacturers of generic Bystolic entered the market and lawfully competed with Defendants earlier, Plaintiffs and other members of the Injunctive Relief Class would have substituted lower-priced generic nebivolol hydrochloride products for the higher-priced brand-name Bystolic for some or all of their nebivolol hydrochloride products requirements, and/or would have paid lower net prices on their remaining Bystolic and/or AB-rated bioequivalent purchases

435.    Plaintiffs and members of the Injunctive Relief Class will continue to suffer injury, in the form of overcharges paid for Bystolic, if Defendants' unlawful conduct is not enjoined.

436.    Plaintiffs and the members of the Injunctive Relief Class therefore seek equitable and injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable laws, to correct for the anticompetitive market effects caused by Defendants' unlawful conduct,

and to assure that similar anticompetitive conduct and effects do not continue or reoccur in the future

**SEVENTH CLAIM FOR RELIEF**
**Violation of Section 1 of the Sherman Act: Pay-For-Delay Agreements**

437.    Plaintiffs incorporate by reference all of the allegations above as though fully set forth herein.

438.    Plaintiffs bring this claim on behalf of the Injunctive Relief Class.

439.    The Forest Defendants paid the Settling Generics at least $15 million, plus consideration in side deals and reimbursement for litigation costs. In exchange for this substantial consideration, the Settling Generics agreed to drop their patent challenges and not to launch their generic Bystolic products to compete with Bystolic until September 17, 2021.

440.    These settlements are unlawful pay-for-delay agreements and illegal contracts, combinations, and conspiracies in restraint of trade. The purposes and effects of these agreements were to: (a) delay and prevent the entry of more affordable generic versions of Bystolic in the United States; (b) fix, raise, maintain, or stabilize the prices of Bystolic; (c) allocate 100% of the U.S. nebivolol market to the Forest Defendants.

441.    Defendants implemented the terms of the agreements, and they achieved their intended purpose. As a direct and proximate result of Defendants' anticompetitive conduct, alleged herein, Plaintiffs suffered harm in the form of overcharges.

442.    There was and is no legitimate, non-pretextual, procompetitive justification for the reverse payments from Forest to the Settling Generics that outweighs their harmful effect. Even if there were some conceivable justification, the payments were not necessary to achieve that purpose. The payments were far in excess of the amount of saved litigation costs.

443.     Plaintiffs and members of the Injunctive Relief Class will continue to suffer injury, in the form of overcharges paid for Bystolic, if Defendants' unlawful conduct is not enjoined.

444.     Plaintiffs and the members of the Injunctive Relief Class therefore seek equitable and injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable laws, to correct for the anticompetitive market effects caused by Defendants' unlawful conduct, and to assure that similar anticompetitive conduct and effects do not continue or reoccur in the future.

## DEMAND FOR JUDGMENT

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the proposed Classes, pray for judgment against Defendants and that this Court:

1.     Determine that this action may be maintained as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2), be given to the Classes, and appoint Plaintiffs as the named representatives of the Classes;

2.     Award Plaintiffs and the Damages Class damages (*i.e.,* three times overcharges) in an amount to be determined at trial, plus interest in accordance with law;

3.     Grant Plaintiffs and the Injunctive Relief Class equitable relief in the nature of disgorgement, restitution, and the creation of a constructive trust to remedy Defendants' unjust enrichment;

4.     Award Plaintiffs and the Classes their costs of suit, including reasonable attorneys' fees as provided by law;

5.     Permanently enjoin Defendants both from continuing the unlawful conduct alleged here, and from engaging in similar or related conduct in the future; and

6.     Award such other and further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs, on behalf of themselves and the proposed Classes, demand a trial by jury of all issues so triable.

Dated: July 27, 2020

*/s/Brian P. Murray*_____
Brian Murray (BM 9954)
Lee Albert (*Pro Hac Vice* forthcoming)
Greg Linkh (GL 0477)
Brian Brooks (BB 7442)
**GLANCY PRONGAY & MURRAY LLP**
230 Park Avenue, Suite 530
New York, NY 10169
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
bmurray@glancylaw.com
lalbert@glancylaw.com
glinkh@glancylaw.com
bbrooks@glancylaw.com

*/s/ Dena Sharp*_____
Dena Sharp
Scott M. Grzrencyzk
Tom Watts
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846
dsharp@girardsharp.com
scottg@girardsharp.com
tomw@girardsharp.com

*Counsel for Teamsters Local 237 Welfare Fund and Teamsters Local 237 Retirees' Benefit Fund*